# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-00429-SCT

*ANTHONY DOSS*

*v.*

*STATE OF MISSISSIPPI*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 12/12/2006 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER, JR. |
| COURT FROM WHICH APPEALED: | GRENADA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT B. McDUFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: MARVIN L. WHITE, JR. |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | PART ONE: REVERSED AND REMANDED. PART TWO: AFFIRMED - 10/22/2009. |
| MOTION FOR REHEARING FILED: | 01/12/2009 |
| MANDATE ISSUED: | |

**EN BANC**.

**GRAVES, PRESIDING JUSTICE, FOR THE COURT:**

### PART ONE

¶1.    The appellant's motion for rehearing is granted. The previous opinions are withdrawn and these opinions are substituted therefor.

¶2.    Anthony Joe Doss was convicted of capital murder in the Circuit Court of Grenada County and sentenced to death for the murder of Robert C. Bell. Doss' conviction and sentence were affirmed by this Court on direct appeal. *Doss v. State*, 709 So. 2d 369 (Miss.

1996), *cert. denied,* 523 U.S. 1111, 118 S. Ct. 1684, 140 L. Ed. 2d 821 (1998). In *Doss v. State*, 882 So. 2d 176 (Miss. 2004), this Court granted Doss' Application for Leave to File a Motion to Vacate Judgment and Sentence, finding that Doss was entitled to an evidentiary hearing in the trial court on the issues of whether he received ineffective assistance of counsel during the penalty phase and whether he was mentally retarded. The trial court considered the evidence and found against Doss on both issues. Doss subsequently filed this appeal. This Court reverses the trial court's denial of post-conviction relief on the issue of ineffective assistance of counsel and remands this matter to the trial court for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

¶3. Doss was convicted of capital murder in the Circuit Court of Grenada County and sentenced to death for the murder of Robert C. Bell. Doss' conviction and sentence were affirmed by this Court on direct appeal. *Doss v. State*, 709 So. 2d 369 (Miss. 1996), *cert. denied,* 523 U.S. 1111, 118 S. Ct. 1684, 140 L. Ed. 2d 821 (1998). Doss filed an Application for Leave to File Motion to Vacate Judgment of Sentence in this Court in May 2003. This Court granted Doss leave to proceed in the trial court on the following issues: (1) Whether he was mentally retarded; and (2) whether his trial counsel had been ineffective at the penalty phase. *Doss v. State*, 882 So. 2d 176 (Miss. 2004).

¶4. The Grenada County Circuit Court held an evidentiary hearing on this matter on September 6-7, 2006. Doss presented the following witnesses: Dr. Criss Lott, a psychologist; Lee Bailey, Doss' trial counsel; Dr. Daniel Grant, a psychologist; Dr. Timothy Summers, a psychiatrist; Q.T. Doss, Doss' cousin; Sadie Doss, Doss' mother; Sandra Price, a daughter

2

of Sam "Joe" Brown, with whom Sadie Doss had lived in Chicago; and Sam Henry Phillips, Doss' biological father. The State presented Dr. Gilbert V. MacVaugh, III, a psychologist, and Dr. Reb McMichael, a psychiatrist, as witnesses. On December 12, 2006, the trial court entered an Order and an Opinion, finding that Doss was not mentally retarded and that he was not denied effective assistance of counsel. Doss' Motion to Alter or Amend Opinion and Judgment was denied. Subsequently, Doss filed this appeal, asserting that he did not receive effective assistance of counsel at the sentencing phase of his trial and that the decision in *Atkins v. Virginia* requires that the death sentence in this case be set aside. *Atkins*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

## ANALYSIS

¶5. The standard of review after an evidentiary hearing in post-conviction-relief (PCR) cases is well settled. This Court has said:

> "When reviewing a lower court's decision to deny a petition for post conviction relief this Court will not disturb the trial court's factual findings unless they are found to be clearly erroneous." *Brown v. State*, 731 So. 2d 595, 598 (Miss. 1999) (citing *Bank of Mississippi v. Southern Mem'l Park, Inc.*, 677 So. 2d 186, 191 (Miss. 1996)) (emphasis added). In making that determination, "[t]his Court must examine the entire record and accept 'that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact . . . .'" *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987) (quoting *Cotton v. McConnell*, 435 So. 2d 683, 685 (Miss. 1983)). That includes deference to the circuit judge as the "sole authority for determining credibility of the witnesses." *Mullins*, 515 So. 2d at 1189 (citing *Hall v. State ex rel. Waller*, 247 Miss. 896, 903, 157 So. 2d 781, 784 (1963)).

*Loden v. State*, 971 So. 2d 548, 572-573 (Miss. 2007). However, "where questions of law are raised the applicable standard of review is de novo." *Brown v. State*, 731 So. 2d 595,

3

598 (Miss. 1999) (citing *Bank of Mississippi v. Southern Mem'l Park, Inc.*, 677 So. 2d 186, 191 (Miss. 1996)). The burden of proof at an evidentiary hearing on a PCR case is on the petitioner to show "by a preponderance of the evidence" that he is entitled to relief. Miss. Code Ann. § 99-39-23(7) (Rev. 2007).

## I. WHETHER DOSS RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE SENTENCING PHASE OF HIS TRIAL.

¶6. Doss asserts that defense counsel, Lee Bailey, failed to properly investigate the available mitigating evidence and presented only one witness in mitigation at the penalty phase.

¶7. The United States Supreme Court established a two-part test for determining a claim of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), as follows:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

¶8. The Court further established that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. With regard to an attorney's duty to investigate, the Court said the following in *Strickland*:

4

These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.

*Strickland*, 466 U.S. at 690-91.

¶9. This Court has applied the *Strickland* standard numerous times and has further said, "an attorney's lapse must be viewed in light of the nature and seriousness of the charges and the potential penalty." *See Ross v. State*, 954 So. 2d 968, 1004 (Miss. 2007) (citing *State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 1990)). In *Ross*, defense counsel offered, as mitigating evidence during the sentencing phase, the testimony of Ross' mother, grandmother, and daughter, a minister from the jail, and a sheriff who had arrested Ross. The testimony referenced Ross' character, and the witnesses described Ross as a "good prisoner." *Id*. at 1005. Counsel's failure to investigate Ross' inmate record led to the admission of highly prejudicial evidence on cross-examination. Ross' counsel also failed to conduct an adequate investigation into potentially mitigating factors, including Ross' psychological problems, and failed to obtain an expert to testify to these factors. This Court noted:

While courts must defer to lawyers' judgments and strategies, "at a minimum, counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case." *Ferguson v. State*, 507 So. 2d 94, 96 (Miss. 1987). Under this standard, counsel may be deemed ineffective for relying almost exclusively on material

5

furnished by the State during discovery and conducting no independent investigation. *Id*. While counsel is not required to exhaust every conceivable avenue of investigation, he or she must at least conduct sufficient investigation to make an informed evaluation about potential defenses. *State v. Tokman*, 564 So. 2d at 1343.

*Ross*, 954 So. 2d at 1005. This Court further said:

[C]ounsel will not be deemed ineffective if there is proof of investigation or if there is no factual basis for the defendant's claim. However, each of these principles presuppose a certain level of investigation. By contrast, "strategic choices made after less than complete investigation will not pass muster as an excuse when a full investigation would have revealed a large body of mitigating evidence." . . . "It is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover."

*Ross*, 954 So. 2d at 1006 (citation omitted).

¶10. In his application for leave filed with this Court in 2003, Doss relied on affidavits[1] from several people with various connections to him, including: Lee Bailey, trial attorney; Kelvin Winbush, Bailey's investigator; Carolyn Watkins, the public defender who handled a separate murder charge against Doss in Shelby County, Tennessee; Sadie Doss, mother; Verlene Forest Williams, friend; Carolyn Phillips, aunt; Ernestine Williams, aunt; Lucretia Monger, sister; Randy Doss, brother; Roselyn Monette Jackson, aunt; Mary Jennings, aunt; John Westmoreland, formerly married to an aunt; Annette James, girlfriend; Marvin Doss,

---

[1]Incredulously, in her dissent, Justice Lamar characterizes our analysis of the affidavits as "lengthy and unnecessary" and then says "it is improper for this Court to consider" the affidavits of Lee Bailey and Kelvin Winbush because "they were never admitted into evidence before the trial court. . . ." However, Justice Lamar quoted these very affidavits at length in her previous majority opinion, which is now being withdrawn on rehearing. Moreover, we quote the published opinion of this Court, *Doss v. State*, 882 So. 2d 176 (Miss. 2004), on Doss' original application for leave and the trial court herein regarding these affidavits, which were indeed filed. Further, the trial court specifically discussed the affidavits in his Order and noted that he considered the affidavit of Lee Bailey. Finally, there was no objection to the use of Bailey's affidavit in the trial court.

6

half-brother; Q.T. Doss, cousin; Lillie Moore, aunt; Sandra Price, daughter of Sam "Joe" Brown, who lived with Doss' mother in Chicago; Chantay Price, Sandra Price's sixteen-year-old daughter; Varnado McDonald, step-sister of Lucretia Monger; Carrie Cole, aunt; Rosie Caldwell, friend of Doss' mother; and Sam Phillips, biological father.

¶11.    With regard to the affidavit of defense counsel Lee Bailey, this Court summarized:

> Doss relies first on the affidavit of his trial attorney who states that: Doss' was the first case he had defended where the death penalty was sought; he did not seek any school, medical, mental health or other records, because he did not realize the importance of the records in presenting a defense during the sentencing phase; he did not seek advice from a mental health expert, funds for a mental health expert or any kind of mental health evaluation; and he did not obtain any records resulting from the investigation of criminal charges against Doss in Shelby County, but he did obtain the indictment and judgment in that case. Bailey also obtained the appointment of an investigator, Kelvin Winbush, who was also the investigator for Doss' co-defendant, Frederick Bell. Bailey stated that Winbush told him he had interviewed: Doss' aunt, Lillie Moore, Doss' sisters, Lucretia Monger and Mavis McCaster; Doss' brothers, Marvin Doss and Randy Doss; and John Westmoreland and that all stated that Doss was a good and/or quiet person who got involved with the wrong crowd. Bailey did not follow up with these witnesses or ask them to testify at the sentencing phase. Bailey stated that Winbush told him he had contacted two teachers in Bruce, a Mrs. Parker and a Coach Smith, but it was questionable as to whether these people actually knew Doss, or whether they had mistaken him for Frederick Bell. Bailey did not realize that a conflict might result from using Winbush, where one of Bailey's potential defense strategies was to blame Bell as the instigator of the shooting. Bailey states that he interviewed only Doss' mother and an aunt for a few minutes. Bailey states that he felt he did a good job in defending the case at the guilt phase, but that he did not know what he was doing as to the sentencing phase.

*Doss*, 882 So. 2d at 186.

¶12.    As to the affidavit of investigator Kelvin Winbush, this Court said:

> Kelvin Winbush's affidavit states that this was his first mitigation investigation, and that he was also the investigator for Frederick Bell. Winbush identified Lillie Moore, Lucretia Monger, Mavis McCaster, Marvin Doss, Randy Doss, and John Westmoreland, a friend, as favorable mitigation

7

witnesses. Winbush also identified Coach Smith, a teacher and coach in Bruce, as someone who knew Anthony and said he "behaved fairly well for the most part." Winbush stated that he gave Bailey contact information for some of the witnesses, and Bailey knew Winbush had contact information for them all. Winbush says that he was never asked to follow up with the witnesses, to arrange for subpoenas, to arrange for their presence at trial, or to look for additional witnesses after Winbush's initial report. He was also not asked to do any investigating in Chicago.

*Id.*

¶13. Carolyn Watkins, public defender in Shelby County, "states in an affidavit that she obtained school records for Doss from Chicago; Doss' medical records from Chicago, including records involving a 1986 head injury; and the 1988 psychological report done at the University of Mississippi. She states that Lee Bailey never requested these records." *Id*.

¶14. As to the remaining affidavits, this Court characterized them as follows:

The affiants say that Doss was shy and quiet, not a violent person; that there were times when Doss seemed to go into a seizure or trance of some kind, when he did not respond to people; that he had mental or medical problems that began with his mother's drinking and drug use during her pregnancy with him, followed by lead poisoning and head injuries during Doss' childhood; that mental illness seemed to run in the Doss family; that Doss was easily led by Frederick Bell, who was a bad, violent person and came from a violent family; that Doss began to run with a bad crowd when he moved from Chicago to Mississippi; that Doss' birth and upbringing in Chicago were riddled with crime, drug abuse and poverty. Specifically mentioned and blamed for much of the misfortune suffered by Doss and his family in Chicago was Sam Brown, who lived with Doss' mother. Doss apparently believed for much of his early life that Sam Brown was his biological father. According to various affidavits, Sam Brown was violent and abusive toward Doss, his mother and the rest of the family; he took what little money the family had to buy drugs and gamble; and he sold drugs and introduced the children in the family to drugs.

*Doss*, 882 So. 2d at 187.

¶15. In finding that Doss should have the opportunity to present evidence to the trial court in support of his claim that counsel's failure to investigate and present available mitigation evidence constituted ineffective assistance of counsel, this Court said:

> We acknowledge that many discrepancies exist among the affidavits presented by Doss in support of this issue. However, we conclude that Doss has made a sufficient showing under the *Strickland* test that Bailey's efforts fell short of the efforts a counsel should make in a death penalty sentencing trial, so as to entitle Doss to an evidentiary hearing on this claim in the circuit court. This was Bailey's first death penalty case, and he admitted that he did not know what he was doing in the sentencing phase. When counsel makes choices of which witnesses to use or not use, those choices must be made based on counsel's proper investigation. Counsel's minimum duty is to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case.

*Id*. at 189.

¶16. The trial court held a PCR evidentiary hearing in 2006 and heard testimony from Lee Bailey, Q.T. Doss, Sadie Doss, Sandra Price and Sam Phillips. On December 12, 2006, the trial court issued an opinion, finding that Doss had not received ineffective assistance of counsel. We find the trial court's findings to be clearly erroneous.

¶17. Doss' application for leave to this Court included, as an exhibit, an affidavit from Bailey, which stated, in relevant part:

> 3. Prior to this, I had never represented a defendant in a capital murder case where the death penalty was sought.
> 4. I did not seek or obtain any school, medical, mental health, or other records regarding Mr. Doss. This was not for any strategic reasons. I did not realize the importance of obtaining such records in order to prepare for the sentencing phase of a capital case.
> 5. I knew the defendant, Mr. Doss, had grown up in Chicago and had gone to elementary school and into the beginning of high school there. I was aware that Mr. Doss had been in special education classes in Chicago and also suffered from blackouts and headaches. However, I did not understand the significance of this and did not seek any advice from a mental health expert.

9

Also, I did not request funds for a mental health expert or any type of mental health evaluation. This was not for any strategic reason.

6. I did not obtain any records from the investigation done in Memphis by Mr. Doss' attorney there. However, I did obtain the indictment and judgment in that case.

. . .

9. I did not ask Mr. Winbush [investigator who provided statements and contact information for several potential witnesses to Bailey] to follow up with any of these potential witnesses, or with anyone else, and I did not follow up with them myself to obtain more information or to determine for myself whether they would be helpful witnesses. I did not ask any of them to testify at the sentencing phase. This was not for any particular strategic reason.

10. Other than the family members just mentioned and Mr. Westmoreland [possible witness who knew Doss], the only other specific individuals Mr. Winbush identified that he had talked to were two teachers in Bruce, Mississippi, Mrs. Parker and someone he identified only as "Coach Smith." But it was Freddie Bell who had gone to school in Bruce, not Mr. Doss, who lived in Calhoun City. Indeed, Mr. Winbush told me that Mrs. Parker had only taught Mr. Bell, not Mr. Doss. Mr. Winbush said that "Coach Smith" knew Mr. Doss and that Mr. Doss had behaved well around him. He never explained how Coach Smith knew Mr. Doss. I did not ask Mr. Winbush to go back for clarification, or to go back and try to find others who might know Mr. Doss as opposed to Mr. Bell, including those who lived in Calhoun City where Mr. Doss presently lived. I did not do this investigation myself and did not try to contact Coach Smith myself.

11. Although I knew Mr. Winbush was working as the investigator for Mr. Bell, I did not consider at the time how this posed a conflict of interest. I was not particularly focused on obtaining evidence for the sentencing phase to show that Mr. Bell was the more culpable of the two, and that he had dominated Mr. Doss and led him into these misdeeds. Had I been focused on that, I might have realized the conflict and sought another investigator.

12. To the extent that Mr. Winbush claimed that he spent 100-120 hours investigating this case, I do not believe this is accurate. Even if you include the time he spent driving and looking for people, I do not think he spent that much time.

13. I did not do any mitigation investigation in Chicago, where Mr. Doss grew up and lived most of his life, and I did not ask Mr. Winbush to do so. I did not contact any witnesses or family members there. I did not seek funds from the Court for such an investigation. This was not for any strategic reason.

14. My time records show that the only family members or friends who I interviewed were the defendant's mother, who was the only witness I presented at the punishment phase, and one of the defendant's aunts, who I did

not call as a witness. The discussion with them lasted only a few minutes according to my records. I did talk again with the defendant's mother during the trial, and prior to her testimony, I discussed the possible testimony with her. However, this discussion was not lengthy and I did not spend much time interviewing her or preparing her to take the stand.

15. The omissions that I have mentioned in this affidavit with respect to the mitigation investigation were not motivated by any particular strategic reason. Although I believe I did a good job in defending this case at the guilt phase, I had never handled a punishment phase in a capital case before. It is unlike anything I have ever done. There's no other proceeding that I have ever been involved in where the jury decides the punishment, and of course, none where the stakes were this high. My omissions in the punishment phase in this case were due, I believe, to my inexperience in this particular type of proceeding. Looking back on it, I believe now that I provided a good defense at the guilt phase, but that I failed to undertake the essential functions of properly and thoroughly investigating mitigation and presenting a defense at the penalty phase.

16. If I failed to make any objections during the trial that should have been made, that was not the result of any strategy decisions.

Lee Bailey Aff. (Aug. 23, 2001).

¶18. After the PCR hearing, the trial court found that the "testimony of Lee Bailey was in sharp contrast with the information that was contained in the affidavit" submitted to this Court, but that Bailey was not trying to mislead, because he did not have access to his case file when he signed the affidavit and was "relying on his memory of events that had taken place over eight years earlier." The trial court also noted that Bailey believed he had not obtained records from Carolyn Watkins, Doss' public defender in Memphis, when he signed the affidavit, but then realized two days before trial that he had actually gotten some of these records.

¶19. The trial court's reasoning was incorrect. Bailey's inability to remember that he had actually obtained these records could not have been because he did not have access to his file. Bailey admitted during redirect examination that the file was available any time he

11

requested it and that McDuff, Doss' present counsel, went so far as to offer to drive the file to Bailey. Also, the following exchange occurred between McDuff and Bailey during the hearing:

> Q. Was there ever a time that you asked me to look at that file that I didn't get it to you within a few days?
> A. No.
> Q. Okay.
> A. Now, there was – there was something he asked awhile ago about meeting halfway in Jackson. I remember something about that. But no, you've always been cordial. You always – whenever I wanted something, you had it right there.

¶20. Moreover, the portion of the file containing the records that Bailey found two days before trial was not even included in the file that was given to McDuff, but rather was found in a storage box in Bailey's office. Specifically, Bailey testified during direct examination in the PCR hearing:

> A. I got some records from Memphis. I think that Caroline Watson [sic] either had them sent to me by someone else or she sent them to me. I don't know, but I got them in my possession. And they weren't in the regular file.
> . . .
> Q. Okay. And, and where did you find them?
> A. In an old file of mine, a big box that I had old criminal files stored away in. I found them in there.
> Q. Were they in a particular file folder that was labeled?
> A. No.

¶21. Bailey further testified that the documents that he discovered two days before the PCR hearing included records from North Mississippi Medical Center, Shelby County government (from Joyce King, legal investigator), Bethany Hospital in Chicago, and a psychological report from the University of Mississippi. Bailey also acknowledged that some of the reports were missing multiple pages and he had never obtained complete copies. Moreover, with the

12

exception of the "forgotten" records, the remainder of Bailey's testimony at the PCR hearing

verified his sworn statements in the affidavit, for example:

Q.      And prior to you signing that affidavit you and I – prior to any affidavit being drafted you and I talked about this case, didn't we?  I came to your office and we talked.
A.      Sure.  Sure.
Q.      And then I drafted an affidavit, and I brought it back to you.  And you and I went over it line-by-line, didn't we?
A.      Sure.
Q.      And you told me that everything in there that you signed in the file [sic] version was true, didn't you?
A.      Sure.
Q.      You signed it under oath, didn't you?
A.      Sure.
Q.      Now, did you lie in that affidavit?
A.      I didn't remember about those files that I got from Caroline Watson [sic].
Q.      Right.  You thought you had not requested those.
A.      I didn't think I had those.
Q.      Is there any place other than that where you said something – you believed it was true at the time.  Was there any place where you said something you didn't believe was true?
A.      No. No. Paragraph 5, about him growing up in Chicago. Yeah. That's true. Having black-outs. Yeah. I didn't seek a medical health expert. That's true. I didn't think that Winbush was a conflict of interest. You know, that's true. I didn't ask him to follow up on any of these witnesses. That's true.
        But now, not being particularly focused on the sentencing hearing, some things have been said in here today that leads me to think that yeah, I was trying to get some witnesses for the sentencing.  But as far as I was concerned and having as little experience as I had, which was absolutely none, I didn't see that there were any witnesses other than what we had.
Q.      And do you recall that when you and I talked about this case, I had your file with me, brought it to Grenada prior to you signing the affidavit so you could go through it?
A.      Brought it to Winona.
Q.      I mean to Winona.  I'm sorry.
A.      Yes. You brought it to Winona.  Yes.
Q.      You had it there prior to signing the affidavit.
A.      You talking about five years ago?
Q.      Yeah.

13

A.     I don't remember that. I just know – I know that you came up and came up fairly often I thought. You were really diligent, but I don't – I just remember signing the affidavit.

In fact, I didn't even remember what was in it. When Doug Evans [prosecutor] was asking me about it, I said I signed an affidavit. I don't remember what it was. But, you know, memory – memory is slipping a little.

Q.     Right. Are you able to say at this point – I want to make this clear. Are you saying at this point that we did not go through the file prior to you signing that?

A.     No, I am not saying that. You went through everything thoroughly.

Q.     And in Paragraphs 4 and 6 about the records, as soon as you found those records you told me; right?

A.     Right.

¶22.   The trial court further found that Doss and his mother were not "forthcoming with many witnesses who could offer testimony that would be favorable to Anthony," and that Bailey was given the name of Derma Police Chief Mark Hendrix, but chose not to call him because of an unfavorable ruling on a motion in limine.[2] Specifically, the trial court found that "[t]his shows that Bailey made an effort to locate any witnesses that Anthony believed could offer testimony that would be favorable to him." The trial court said:

> This court during the evidentiary hearing heard many tales of woe concerning the environment in which Anthony was reared, including an abusive father/stepfather and an indifferent and alcoholic mother. However, this information was not provided to Bailey during his representation of Doss. Sadie testified that she did not share the information concerning Anthony with Bailey. She stated that only after getting to know McDuff and thinking of him as a brother, did she share information with McDuff concerning the details of her life and of Anthony's upbringing.
>
> This court does not believe that the failure of Bailey to learn the sordid details of the life of Sadie Doss and of Anthony, in any way indicates that Bailey was ineffective. He was relying on Sadie and Anthony to provide information about Anthony's life and of potential witnesses that could testify favorably about Anthony. If those two did not provide that information to Bailey, he is not to blame for their lack of forthrightness. Only from them,

---

[2]Bailey admitted during redirect examination that he also could have filed a motion in limine to prohibit the introduction of evidence of the youth court charges, but failed to do so.

14

could he have learned the names of Q.T. Doss, Sam Phillips, Sandra Price, or the individuals that submitted affidavits to the Mississippi Supreme Court, but did not testify at the hearing.

Op'n, Circuit Court of Grenada County, at pp. 9-10 (Dec. 12, 2006).

¶23. The trial court said that Sadie had failed to provide certain information to the University of Mississippi during an unrelated proceeding in 1988 and during a brief discussion with Bailey in 1993, saying:

> This court will not speculate as to whether she failed to provide this information to the University of Mississippi and to Bailey due to embarrassment, or whether much of her testimony in the evidentiary hearing was a figment of her imagination due to too many years of drinking Crown Royal and beer, or whether her testimony is laced with perjury [n4] and exaggeration in an attempt to free Anthony from death row. However, this court is of the opinion that Bailey did the best he could with the 1993 version of the truth that was provided by Sadie.
>
> > n4    She either perjured herself in Anthony's original trial or at the evidentiary hearing. At the trial, she testified that Sam Brown was Anthony's father. Now she claims his father is Sam Phillips.

Op'n at p. 11.

¶24. However, the trial court's findings are contradicted by the record in this matter. The record establishes that Bailey spoke only briefly to Sadie by telephone and never met with her in person prior to Doss' trial in 1993. Further, during the sentencing phase of Doss' trial, Bailey failed to ask a single question that would evoke any "sordid details of the life of Sadie and Anthony" or that would evoke any "tales of woe" about abuse as stated by the trial court. The relevant portions of Sadie's testimony on direct examination by Bailey from 1993 are as follows:

Q.    Now, where was Anthony born?

15

A.    Chicago.
Q.    And, who is his father?
A.    Sam Brown.
Q.    Is Sam here today?
A.    No, he's not.  He don't know anything about it.
. . .
A.    He's not here.  He don't know anything about it.  I got – I tried to get
       in touch with  him, but I couldn't.
Q.    And, are you and Sam married?
A.    No, we not; common law.
Q.    How long did Anthony live in Chicago?
A.    I think 16 years, if I'm not mistaken.  15 or 16 years.
Q.    And, then where did he move to?
A.    Calhoun City.
Q.    And, he's been living there with you?
A.    Yes.
Q.    Did he go to school there?
A.    A period of time.
Q.    How long?
A.    I really don't know.  I think about a couple of months.
Q.    What grade has Anthony completed in school?
A.    It was 'twixt [sic] the 9th and the 10th.
Q.    Has he been working?
A.    No.  He went to look for a job.  They say he's too short and too young.
. . .
Q.    Do you have any other relatives that live there with you?
A.    Talking about in Calhoun City?
Q.    Uh-huh.  (Affirmative.)
A.    When Anthony was with me?
Q.    Uh-huh.  (Affirmative.)
A.    Yes, I did.
Q.    How many?
A.    One.
Q.    And, what kind of home did you have?
A.    Beautiful home.  One more thing.  You say who all stayed.  My other
       – I have one daughter stayed with me, period.
Q.    Now, do you work?
A.    No, I don't.  I been sick.
Q.    Huh?
A.    I'm sick.
Q.    How long you been sick?
A.    For 20-something years.

Q. Now, what kind of income does your family have? When Anthony was living there with you?

A. I was on welfare at the time.

. . .

Q. And, he didn't graduate from high school?

A. Only from the 8th.

Q. Now, you know Anthony. Would you tell us how – what kind of person is Anthony?

A. Anthony was a warm, beautiful person, and he alway [sic] at home with me, and when I was sick he always would get up and he try to fix me food. Sometimes I can't walk. The arthritis have me sometimes. Like today, I may be able to walk just as straight as any of y'all and then the next couple of days, I may not can walk. I have to walk with a crutch. And, he would do for me. He always said, "Mama, I want to get a job, where I can take care of you." And, Anthony also was playing ball one day and this – a man came through the alley and hit him on the head and busted his head, and I took him to the doctor. He had a concussion. So, Anthony was very good. And, after that he started having headaches, and I took him to the doctor.

Q. When was this that he got hit in the head?

A. It was when he was about 11. And he also got hit in the head when he was about 17, I think. At 17 he got hit in the head again.

Q. Now, when you say hit in the head, are you talking serious?

A. Yes.

Q. All right, hospital?

A. I took him to the hospital and they release him, and he also was hit again and he was taken to the hospital, and they sent me a statement from Chicago – from the hospital – that – I don't have the papers now – that his hand was hurt and his head was busted.

Q. All right, now, when he got hit in the head these times did you notice any change in Anthony?

A. He would have headaches. Some days he won't say nothing. Then, the next day, he talk. But, he didn't bother nobody.

¶25. Clearly, counsel was aware of Doss' head injuries, yet failed to investigate the details behind these injuries or to present any other evidence during the sentencing phase regarding the extent of the injuries and any long term or permanent damage -- despite portions of the hospital records and various psychological evaluation reports being provided to Bailey by

17

the public defender's office in Shelby County.[3] If counsel had inquired further into Doss'

injuries, counsel easily would have obtained the names of potential witnesses such as Sandra

Price, whom the record reveals was raped during the same home invasion when Doss was

beaten with a pipe. If counsel had reviewed the records in his possession, he also would have

discovered other possible witnesses, including Doss' brothers and sisters. Also, counsel

appeared surprised at Sadie's statement that she had been sick. Counsel failed to ask a single

question about whether Doss had ever been abused, what kind of environment he had been

exposed to in Chicago, how he did in school, whether he was in special education classes,

or anything else that could have been mitigating. Counsel merely asked what kind of home

Sadie had in Mississippi, not Chicago, and what kind of person Doss was, without delving

into any other relevant evidence. The duty of reasonable investigation rests squarely on

counsel's shoulders. There is nothing in the record to establish that counsel undertook a

reasonable investigation.

¶26.    During the PCR hearing, Sadie Doss testified that Sam Brown is the father of her

other son, Randy Doss, and that she was living with Sam Brown at the time she became

pregnant with Anthony. Sadie testified that Sam Phillips is actually Doss' biological father,

but that Doss was told his father was Sam Brown and that she felt Sam Brown was his father

because he helped raise Doss. Sadie further testified that the family suffered violent abuse

at the hands of Sam Brown, who Doss believed was his father for several years and with

whom they lived until Doss was approximately fifteen years old. Sadie testified that she

---

[3]The dissent would find Bailey's failure to investigate Doss' head injuries as proper under an entirely separate and inapplicable theory of competency. The dissent later notes the trial court's finding that "Doss did not appear to be insane." Doss' sanity is not at issue.

18

drank heavily during her pregnancy with Doss, that Sam Brown beat her so violently that she began bleeding and almost suffered a miscarriage, that Sam Brown infected her with gonorrhea while she was pregnant, and that she took the medication Valium while she was pregnant. In addition, Sadie testified that Doss had lead poisoning as a child; that he had witnessed Sam Brown beating her; that he was beaten and abused by Sam Brown; that Sam Brown had abused drugs and spent the family's money on drugs; that the family had lived in a very poor, bad, drug-infested neighborhood where gangs were prevalent in Chicago;[4] and provided various other relevant evidence that trial counsel failed to even inquire about during the sentencing phase of Doss' original trial.

¶27. With regard to personal information that was not reported during the interview at the University of Mississippi in 1988 stemming from an unrelated youth court matter, Sadie testified as follows:

> Q. Okay. Now, these sorts of things, the things that – the infection you got, the beatings while you were pregnant, the beatings while you were with Sam Brown, are those things you would – you would tell strangers?
> A. No.
> Q. Would you tell many people about those things?
> A. No.
> Q. Why not?
> A. It would hurt me, and people laugh. I had told someone, and they laughed about it.
> Q. Do you – do you ever remember taking Anthony to be seen by a psychologist over in Oxford?
> A. Yes.

---

[4]Sandra Price, Sam Brown's daughter who also lived with the family in Chicago, likewise testified during the PCR hearing that the family had lived in a very bad neighborhood, and that Brown had used drugs and was very angry and abusive toward the family. Price also testified about the home invasion in which she was raped and Doss was beaten, suffering a head injury, and that Doss was very quiet and kept to himself.

Q. Okay. Do you remember them asking you about your pregnancy?

A. No, I don't.

. . .

Q. Miss Doss, you said you didn't tell many people about this. Why did you tell me?

A. Well, y'all were just so comfort [sic]. Just like he was my own family, and I would talk to y'all. Just something there about you was just like family, and I don't tell everybody.

Q. Did you and I spend a lot of time together?

A. Yeah.

Q. Did you feel like you got to know me?

A. Yes, I did. Just like if you was a brother.

Q. Did I explain this might be important for Anthony's case?

A. Yes.

Q. Did I ask you to make up anything?

A. No.

Q. Did I ask you to say something that wasn't true?

A. No.

. . .

Q. Did Lee Bailey ask you about any of these private – would he ask you any of these questions about private details, the lawyer, Anthony's trial lawyer?

A. No, he did not.

Q. Okay. Did you feel like you got to know Mr. Bailey very well?

A. No, I did not.

¶28. Also, testimony was offered by psychological experts during the PCR hearing as to why Sadie initially may not have provided this information. During direct examination of court-appointed expert Dr. Criss Lott, counsel for Doss asked Lott whether it was necessary to spend time with people to get them to discuss private matters. Lott answered: "That varies. I think some people may be very open. Some people certainly may be reluctant. In the custody evaluations I do, I rarely get information from people. They don't want to get involved. No matter how many times I try to contact someone like that, I may never get any information." Further, during cross examination of Lott, the State elicited as follows:

20

Q.     Yeah.  But, but you are – you have to rely on this sort of stuff and the validity of those things.  Do you find it interesting that the problems that Miss Doss decided she had after the conviction, much longer after he was convicted and sentenced to death, are not the same ones she had when she was having him treated in 1988 at the – or interviewed or assessed at Ole Miss or at Tupelo?

MR. MCDUFF:  I am going to object to that evidence.  It makes a characterization that is not supported by the evidence or in the evidence.

THE COURT: I'll overrule the objection.

A.     Mr. White, the evaluation that was done in '88 by the University of Mississippi was a youth court evaluation which was looking, assessing Mr. Doss at that time prior to going to possibly training school.  It was not what I would consider to be a comprehensive evaluation and certainly not a comprehensive forensic evaluation.  I do those evaluations too, the youth court.  And my report would not be as exhaustive and I would ask the mother about substance abuse history but a lot of times they may be minimizing that, because it is not something that they want to own up to at that point.

So it's – I see it.  I see that occasionally, that people – in terms of the context that if I'm trying to get an evaluation for a child as to whether or not they should get mental health treatment and go to Oakley.  I don't always get all the data from the parents.

And I'll evaluate the parent, but they may not tell me everything at that time.  So it's – I see that and I understand your concern here.  But for me it hasn't been that unusual, not to get all the data in certain cases.

¶29.    Dr. Timothy Summers also testified about this:

Q.     In obtaining information that a person might consider private or embarrassing, is it important for the psychologist or psychiatrist, whoever is interviewing them, to take their time with that person to explain?
A.     Yes.
Q.     Explain why this private, perhaps embarrassing, information is being sought.
A.     Yes.
Q.     Dr. Lott testified earlier about the difference between the cursory evaluation and more extensive forensic evaluation.  Is it possible that a cursory evaluation, like a youth court evaluation, a person might not reveal embarrassing information but then later might do so once they are approached and the importance is explained to them of talking about private details?
A.     Yes.

21

Again, there is nothing in the record to indicate Bailey ever asked Sadie any questions that would elicit this evidence. Moreover, even if neither Doss nor Sadie had provided any mitigating evidence, Bailey still would not have been relieved of his duty to investigate. *See Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) ("[E]ven when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase . . . .") In *Rompilla*, the evidence in mitigation included the brief testimony of five of Rompilla's family members arguing for residual doubt, asking for mercy, and saying that Rompilla was innocent and a good man. On PCR, Rompilla raised ineffective assistance of counsel for failure to present significant mitigating evidence about his childhood, mental capacity and health, and alcoholism. The trial court denied relief, and the Pennsylvania Supreme Court affirmed. Rompilla then petitioned for a writ of habeas corpus in federal district court, which found, in relevant part, that counsel had failed to investigate "pretty obvious signs" of Rompilla's troubled childhood and his mental illness and alcoholism, "and instead had relied unjustifiably on Rompilla's own description of an unexceptional background." *Rompilla*, 545 U.S. at 379. The Third Circuit Court of Appeals reversed, finding in part that counsel had attempted to uncover mitigation evidence by interviewing Rompilla and family members and by consulting with three mental health experts. After granting certiorari, the United States Supreme Court reversed, noting that this "case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter

22

the State's evidence of aggravated culpability with evidence in mitigation." *Id*. at 380-81. Applying a standard of reasonableness, the Court addressed the minimal contributions of Rompilla and his family members to any mitigation case and the lack of useful information provided by the mental health reports. The Court also said:

> When new counsel entered the case to raise Rompilla's postconviction claims, however, they identified a number of likely avenues the trial lawyers could fruitfully have followed in building a mitigation case. School records are one example, which trial counsel never examined in spite of the professed unfamiliarity of the several family members with Rompilla's childhood, and despite counsel's knowledge that Rompilla left school after the ninth grade. . . . Other examples are records of Rompilla's juvenile and adult incarcerations, which counsel did not consult, although they were aware of their client's criminal record. And while counsel knew from police reports provided in pretrial discovery that Rompilla had been drinking heavily at the time of his offense, . . . , and although one of the mental health experts reported that Rompilla's troubles with alcohol merited further investigation, . . . , counsel did not look for evidence of a history of dependence on alcohol that might have extenuating significance.

*Rompilla*, 545 U.S. at 382 (citations omitted).

¶30.    In the instant case, Bailey somehow obtained the records from the separate action in Memphis, although he was unclear on how exactly that came about, but there is no evidence he ever actually reviewed the records, which would have opened up several possible mitigation leads. These reports included information that Doss: drank alcohol regularly and had started drinking at age eleven; had tried other drugs; was in special education classes and had done poorly in school; had a low IQ; had family and legal issues in Chicago; exhibited characteristics of various psychological disorders; and that his mental difficulties may have had an organic basis. Bailey failed to request complete copies of the records that were missing pages and he failed to request any records on his own. Additionally, counsel failed

23

to follow up with any of the potential witnesses interviewed by investigator Winbush. Also, Bailey failed to do anything more than a brief, cursory telephone interview with Sadie Doss, who was his sole mitigation witness.

¶31. Counsel's performance was clearly deficient under *Strickland*. However, Doss must also show that the deficient performance prejudiced his defense, i.e., but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*., 466 U.S. at 687. In *Rompilla*, the Court found:

> The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts. With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case. Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla's family, whom trial counsel did not interview.

*Rompilla*, 545 U.S. at 391. The Court then summarized the evidence that would have been unearthed, including that Rompilla's parents were both severe alcoholics, that his mother drank during pregnancy, and that his father had a vicious temper and often beat both the mother and Rompilla. The Court also noted the evidence uncovered by Rompilla's post-conviction counsel, specifically, that Rompilla suffered from organic brain damage, that his problems related back to his childhood and that they were likely caused by fetal alcohol syndrome. With regard to the prejudice prong of *Strickland*, the *Rompilla* Court said:

> This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have

24

influenced the jury's appraisal' of [Rompilla's] culpability," ***Wiggins v. Smith***, 539 U.S. [510], at 538, 156 L. Ed. 2d 471, 123 S. Ct. 2527 (quoting ***Williams v. Taylor***, 529 U.S. [362], at 398, 146 L. Ed. 2d 389, 120 S. Ct. 1495), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, ***Strickland***, 466 U.S. at 694, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

*Id*. at 393.  If Doss' trial counsel had reviewed the records provided by the public defender's office in Shelby County and had followed up with potential witnesses, he would have uncovered mitigating evidence almost identical to that in ***Rompilla***.

¶32.    Pursuant to the ***Rompilla***, ***Wiggins***, and ***Williams*** cases cited above, the mitigation evidence discovered by Doss' post-conviction counsel, "taken as a whole, might well have influenced the jury's appraisal of Doss' culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." ***Rompilla***, 545 U.S. at 393.  Accordingly, the judgment of the Circuit Court of Grenada County denying post-conviction relief is reversed, and this matter is remanded to the trial court with instructions to vacate the death sentence and to grant Doss a new sentencing hearing.

**PART TWO**

**LAMAR, JUSTICE, FOR THE COURT:**

**II.  WHETHER THE DECISION IN *ATKINS V. VIRGINIA* REQUIRES THAT THE DEATH SENTENCE IN THIS CASE BE SET ASIDE.**

¶33.    In his request for post-conviction relief filed in 2003 with this Court, Doss alleged that his death sentence would violate the Eighth Amendment's prohibition against the execution of the mentally retarded.  *See **Atkins v. Virginia***, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).  Doss relied on a neuropsychological evaluation performed by Dr. Michael

25

Gelbort and the affidavits of Dr. James Merikangas, a psychiatrist, and Jeffrey Eno, a clinical social worker. This Court found that "Doss has more than met the threshold requirement to be heard on the *Atkins* issue" and granted Doss leave to present his *Atkins* claim before the trial court. In so finding, this Court relied on its decision in *Chase v. State*, 873 So. 2d 1013 (Miss. 2004), wherein this Court attempted to clarify the application of *Atkins v. Virginia* in the trial courts of this state. In *Atkins,* the Supreme Court set forth two, almost identical, definitions of mental retardation.[5] *Atkins*, 536 U.S. at 309 n.3. These definitions were

---

[5]The first definition was provided by the American Association on Mental Retardation (AAMR):

> "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, and work. Mental retardation manifests before age 18."

*Atkins*, 536 U.S. at 309 n.3 (quoting Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed. 1992)).

The second definition was provided by the American Psychiatric Association:

> "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 55-75 to approximately 70. *Id.*, at 42-43.

26

adopted by this Court in *Foster v. State*, 848 So. 2d 172, 175 (Miss. 2003), and further examined in *Chase v. State*, 873 So. 2d 1013, 1029 (Miss. 2004). Both definitions of mental retardation require not only significantly subaverage intellectual functioning, but also related or significant limitations in adaptive skills that occur before age eighteen. *Atkins*, 536 U.S. at 309 n.3. All three factors, (1) significant subaverage intellectual functioning, (2) related or significant limitations in adaptive skills, and (3) manifestation before age 18, must be met in order for the offender to be classified as mentally retarded and eligible for *Atkins* protection from execution. *Id.*

¶34.   The case *sub judice* exemplifies what the *Atkins* majority recognized, that "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . . Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317. In examining the scope of *Atkins*, our Court has recognized that "*Atkins* exempts *all* mentally retarded persons–even those who are minimally mentally retarded–from execution . . . ." *Chase v. State*, 873 So. 2d 1013, 1026 (Miss. 2004). With recognition of the difficulty in "determining which offenders are in fact retarded[,]" the Supreme Court left to the states "the task of developing appropriate ways to enforce the constitutional restriction" on the execution of sentences. *Atkins*, 536 U.S. at 317. Unlike many states, our state Legislature has not chosen to address

---

*Id.*

27

the issue of mental retardation in the context of death-penalty litigation. Unless and until it does so act, we are bound to provide guidance to our trial courts and to apply the constitutional mandates of *Atkins*.

¶35. Following remand by this Court, the Grenada County Circuit Court in July 2004 ordered that Doss be sent to the Mississippi State Hospital ("Whitfield") for a forensic mental health evaluation to assist the circuit court in determining whether Doss was mentally retarded as defined in *Atkins* and *Chase*. Doss was examined at Whitfield by Drs. Gilbert MacVaugh III, Criss Lott, John Montgomery, and Reb McMichael ("Whitfield doctors") in November 2005. According to Dr. Lott, the Whitfield doctors found, to a reasonable degree of psychological and psychiatric certainty, that Doss was not mentally retarded as set forth in *Atkins* and *Chase*.[6] They specifically concluded that Doss had an overall IQ score of 70[7] and was in the borderline range of intellectual functioning. The evaluation stated that Doss' true IQ score may have been higher, but possible malingering or fatigue may have factored into the scoring.

¶36. The evaluation further stated that Doss did not have a history of significant deficits in adaptive functioning due to intellectual limitations. The evaluation noted that Doss had worked, cared for himself, and met his own basic needs, and had shown no signs of significant deficits as far as social/interpersonal skills, communication, use of community

---

[6]A report setting forth the findings of the Whitfield doctors was admitted into evidence through the testimony of Dr. Lott. While the trial court received testimony from Drs. Lott, MacVaugh, and McMichael, the report entered into evidence provides the findings of all the doctors; thus, we speak in terms of the report's contents.

[7] As the dissent aptly notes, the Whitfield Report lists a full-scale IQ score of 71. However, Dr. Gilbert McVaugh testified that the correct score is 70.

28

resources or leisure activities were concerned. The evaluation stated that Doss' suggested problems in areas such as functional academics, work, self-direction, health, and safety were better explained by his chaotic upbringing than by intellectual deficits. The evaluation found that Doss was "fairly adept in coping with the life demands for someone his age in that environment."

¶37. Finally, the evaluation stated that, despite the presence of several risk factors for mental retardation, Doss had at least two prior psychological evaluations at the age of fifteen, neither of which resulted in a diagnosis of mental retardation. These evaluations found that Doss did not demonstrate deficits consistent with mental retardation prior to reaching the age of eighteen.

¶38. Doss also was examined by Dr. Daniel Grant in May 2005. Grant found that Doss' test results were similar to test results obtained by other psychologists, which indicated consistent effort and a lack of malingering. Grant found that, as the complexity of a task increased, Doss' level of performance decreased. Grant agreed with earlier findings of Dr. Gelbort that Doss' test results and past history were consistent with "neuropsychological impairments and probable organic brain dysfunction" and were "likely both congenital and acquired at an early age." Grant found that Doss' IQ score of 71, recorded when he was fifteen, would actually be in the 66-to-67 score range when corrected. Grant found that the tests he had administered clearly placed Doss' level of functioning within the mild mental retardation range of intelligence, and also showed significant impairments in adaptive-behavior skills. Grant found that Doss' test results were "consistent with the diagnosis of Mild Mental Retardation as defined in the Diagnostic and Statistical Manual of Mental

29

Disorders Fourth Edition - Text Revision, Mental Retardation Definitions, Classification, and Supports, Tenth Edition published by the American Association on Mental Retardation and as described by the United States Supreme Court in the Atkins decision."

¶39.   Doss also was examined by Dr. Timothy Summers in July 2006.  Summers did not perform any testing on Doss but relied on prior tests and reports by others.  Summers found that Doss was mentally retarded "as defined in *Atkins v. Virginia* as manifested by an IQ of 71 and limitations in adaptive functioning in at least two areas of functioning significantly lower than his peers of equal age prior to the time that he was 18."  Summers further found that Doss "meets the mental retardation criteria(s) as defined by the American Association of Mental Retardation, which defines mental retardation as an IQ between 70-75 as well as adaptional functional limitations described above along with identification of sub average intellectual functioning prior to age 18."  Summers found that Doss "experienced significant limitations in his effectiveness in meeting the day to day challenges in learning, personal independence and social responsibility."  Summers found that Doss was easily influenced and had poor social judgment regarding association with negative peer groups.  Summers concluded that Doss would likely be the least smart person in any peer group and had problems with logic, foresight, strategic thinking, and understanding consequences.

¶40.   The circuit court considered the expert testimony and lay witnesses presented by the parties and found that Doss had not proven by a preponderance of the evidence that he was mentally retarded.  The circuit court found that the Whitfield doctors, who had determined that Doss was not retarded, were more credible than Drs. Summers and Grant, who had found that Doss was retarded.  The record revealed that Dr. Grant had not administered any tests

30

to show lack of malingering, as required by *Chase*.[8] The court also found that Dr. Summers did not test for malingering.

¶41. The circuit court noted that all of the examiners had opined that Doss met the first requirement of mental retardation, that he displayed subaverage intellectual functioning, and, as a result, the court analyzed only the issue of deficits in adaptive functioning. The court noted that Drs. Grant and Summers had made the required findings in this area to determine that Doss was retarded. It further found that Dr. Grant had relied strictly on tests he had administered to Doss and had spoken to no family members or other persons besides Doss. The court found that the tests used by Grant had not been normed for prison populations. Dr. Summers made his finding based on his interview with Doss, affidavits from family members, and prior testing.

¶42. The circuit court noted that Drs. MacVaugh and Lott had interviewed Doss, numerous family members, and others who had observed him in the past. Doss was given two tests by the examiners at the Mississippi State Hospital to assess malingering, one of which indicted possible malingering. The court noted that Drs. MacVaugh and Lott had determined that Doss did not have deficits in adaptive functioning, and that Doss had held legal jobs and had obtained money illegally, saved and spent his money, bought his clothes and prepared his food, played sports, and engaged in personal relationships. The court found the Whitfield doctors' "approach and the methodology that they used is much more compelling than the approach used by experts offered by Doss." The circuit court adopted the findings of Drs.

[8] The court noted that Dr. Grant had assessed malingering in terms of consistency in test-taking behavior, but that he had not administered a specific test to assess malingering.

31

MacVaugh, Lott, and McMichael, and found that Doss had failed to prove, by a preponderance of the evidence, that he was mentally retarded.

¶43.    Doss argues that the circuit court erroneously rejected Dr. Grant's finding of mental retardation because Dr. Grant failed to test for malingering as required by *Chase*. According to Dr. Grant, he determined that Doss was not malingering by the consistency of scores of tests taken in the past. While the circuit court certainly noted this action or inaction by Dr. Grant, this was not the only factor in its decision to reject Dr. Grant's findings. Further, it was an appropriate consideration for the court when reviewing the totality of the evidence presented.

¶44.    Doss next argues that the circuit court erred in accepting the opinions of Drs. MacVaugh and Lott over that of Dr. Grant on the issue of adaptive functioning, even though Dr. Grant was the only one to administer adaptive-functioning tests. Doss also argues that the tenth edition of Mental Retardation: Definition, Classification, Assistance, and Support, by the AAMR, specifically requires adaptive-functioning testing in order to determine mental retardation, and Dr. Grant's opinion, which was based on the tenth edition of Mental Retardation and included such testing, was the only credible opinion given at Doss' hearing. As we will explain *infra*, these arguments are flawed for two reasons: (1) this Court has recently held in *Lynch v. State*, 951 So. 2d 549 (Miss. 2007)*,* that there is not one test to determine mental retardation, including the adaptive functioning component; and (2) there is no agreement among scholars or professionals as to the proper testing to be used in assessing adaptive functioning.

¶45. This Court clarified the nature of testing for and defining mental retardation in *Lynch v. State*:

> Accordingly, in Mississippi it is acceptable to utilize the MMPI-II and/or other similar tests. *Id.* at 1029. This Court did not intend by its holding to declare the MMPI-II or any one test as exclusively sufficient. Having a variety of tests at their disposal, courts are provided with a safeguard from possible manipulation of results and diminished accuracy which might result if courts are limited to one test. The United States Supreme Court mentioned the Wechsler Adult Intelligence Scales Test. *See Atkins*, 536 U.S. at 309 n.5, 122 S.Ct. 2242. Other tests, as suggested by mental health experts, include the Structured Interview of Reported Symptoms (SIRS), the Validity Indicator Profile (VIP), and the Test of Memory Malingering (TOMM). *See* Douglass Mossman, [Atkins v. Virginia]*: A Psychiatric Can of Worms,* 33 N.M.L. Rev. 255, 277-78 (Spring 2003).

> The Court's interpretation in this case as to the proper test to be administered with regard to an *Atkins* hearing supercedes any contrary decisions. This Court neither endorses the MMPI-II as the best test nor declares that it is a required test, and decisions that state otherwise are expressly overruled. *See, e.g. Scott v. State*, 938 So. 2d 1233, 1238 (Miss. 2006) (holding that despite the doctor's use of a battery of other tests, administration of the MMPI-II is required prior to an adjudication of a claim of mental retardation); *Goodin v. State*, 856 So. 2d 267, 277 (Miss. 2003) (declaring that the MMPI-II is to be administered for a determination of mental retardation since it is the best test to detect malingering). *Our trial courts are free to use any of the above listed and approved tests or other approved tests not listed to determine mental retardation and/or malingering by a defendant.*

*Lynch*, 951 So. 2d at 556-57 (emphasis added). The trial court did not have the benefit of *Lynch*, as it was decided after the circuit court issued its opinion on Doss' mental retardation. The Whitfield doctors followed *Chase* as this Court directed in *Doss v. State*, 882 So. 2d 176, 190-91, 192 n.1 (Miss. 2004), and based their opinion on the ninth edition of Mental Retardation. Under *Lynch*, the experts who examined Doss and the circuit court were free to use or consider any approved test "to determine mental retardation and/or malingering by a defendant." *Lynch,* 951 So. 2d at 557.

33

¶46.   Furthermore, the conceptualization of "adaptive behavior" or "adaptive skills" has proven elusive.  Note, *Implementing Atkins*, 116 Harv. L. Rev. 2565, 2573 (2003); Lois A. Weithorn, *Symposium: Conceptual Hurdles to the Application of* Atkins v. Virginia, 59 Hastings L.J. 1203, 1219 (2008) ("there is no single, commonly-accepted conceptualization of 'adaptive behavior'"); *see also* Dora W. Klein, *Categorical Exclusions from Capital Punishment: How Many Wrongs Make a Right?*, 72 Brooklyn L. Rev. 1211, 1234 n.3 (2007) (noting that scholars and courts alike find that determinations regarding adaptive functioning are often subjective).  There has been confusion not only about the concept itself, but also disagreement as to its value.  Note, *Implementing* Atkins, 116 Harv. L. Rev. at 2575.  Some studies have suggested that IQ remains the best way of measuring intelligence in some contexts.  *Id.*; *see also* James W. Ellis and Ruth A. Luckasson, *Symposium on the ABA Criminal Justice Mental Health Standards: Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 422 n.46 (citing Zigler, Balla & Hodapp, *On the Definition and Classification of Mental Retardation*, 89 Am. J. Mental Deficiency 215, 227 (1984)) (noting that three scholars have proposed that adaptive functioning be omitted from the definition of mental retardation because "'the essence of mental retardation involves inefficient cognitive functioning'").

¶47.   Adaptive functioning historically has been assessed "on the inherently subjective bases of interviews, observations, and professional judgment."  Klein, 72 Brooklyn L. Rev. at 1235.  In recent decades, researchers have developed an increasing number of test instruments for quantifying adaptive functioning, only a few of which have gained acceptance in the field.  *Id.*; Weithorn, 59 Hastings L.J. at 1220.  These tests provide a

necessary objective measurement but offer no panacea. There are "no generally accepted psychometric instruments for measuring adaptive skill levels that are commensurate in reliability with IQ tests." Note, *Implementing* Atkins, 116 Harv. L. Rev. at 2575 n.72 (citing AAMR, Mental Retardation: Definition, Classification, and Systems of Supports, 24, 87-90 (10th ed. 2002)) (noting that the AAMR concedes that there is no consensus regarding tests for adaptive behavior, but states there are a number of tests with "excellent psychometric properties"). One commentator suggests that existing measurement instruments are inadequate and have very little utility in the ***Atkins*** context. Weithorn, 59 Hastings L.J. at 1222.

¶48. By citing these controversies, we in no way suggest that this Court abandon the adaptive-behavior prong, or intimate that the tests for measuring adaptive functioning are inherently unreliable. Our point is to illustrate that there is considerable, sincere disagreement among professionals and scholars in the field as to the best method for measuring adaptive functioning. The concept and measurement of adaptive functioning is an unsettled area without consensus among experts and therefore, we cannot find that the Whitfield doctors' opinions are baseless, or that the trial judge clearly erred in accepting their opinions.

¶49. We also find evidence which reasonably supports the trial judge's conclusion that the opinions of the Whitfield doctors were more compelling. Although Dr. Grant tested Doss for impairments in adaptive-skill behaviors, he spoke to no family members or other persons besides Doss. Interviews with family members, and others familiar with an individual's typical behavior over an extended period of time in various settings, can supplement or aid

35

in the interpretation of test results. Peggy M. Tobolowsky, Atkins *Aftermath: Identifying Mentally Retarded Offenders and Excluding Them From Execution*, 30 J. Legis. 77, 98 (2003) (using different sources of data is recommended rather than placing sole reliance on the adaptive-skill assessment instrument); Linda Knauss & Joshua Kutinsky, *Into the Briar Patch: Ethical Dilemmas Facing Psychologists Following* Atkins v. Virginia, 11 Widener L. Rev. 121, 130-31 (2004). Additionally, testing instruments for assessing adaptive-functioning impairments can, for a variety of reasons, "be less than ideal for assessing adult criminal defendants who might be mentally retarded." Klein, 72 Brooklyn L. Rev. at 1235 (citing certain problems such as the unavailability of caregivers or other reliable independent sources, the use of inappropriate norms, and the atypical environment of a prison); Knauss & Kutinsky, 11 Widener L. Rev. at 131 ("Few (if any) measures of adaptive functioning have been designed or normed for use with a correctional population. Thus, adaptive functioning prior to incarceration should be the target for assessment."); Note, *Implementing* Atkins, 116 Harv. L. Rev. at 2576 (noting that an individual's environment may add a layer of uncertainty to diagnosing adaptive-skill deficits). Indeed, Dr. Lott stated that he knew of no studies that have normed an adaptive-functioning test for those on death row, and Dr. Grant admitted that the adaptive-functioning tests he administered were not normed for a prison population.

¶50. In sum, we have in this case experts who take opposite positions as to whether Doss is mentally retarded. Neither side's methodology, approach, or understanding of the issue is infallible. The ultimate issue of whether Doss is, in fact, mentally retarded for purposes of the Eighth Amendment, is one for the trial judge, who sits as the trier of fact and assesses

36

the totality of the evidence as well as the credibility of witnesses. While expert opinions are helpful and insightful, the ultimate decision of mental retardation is not committed to the experts, but to the trier of fact. As the United States Supreme Court has noted, "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." *Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002).

¶51. The trial judge heard all the evidence and the expert opinions offered, and found the Whifield doctors to be more credible. The trial judge followed the procedures we set forth in *Chase* and concluded that Doss had failed to prove by a preponderance of evidence that he is mentally retarded. For the reasons set forth herein, this Court cannot say that the trial judge clearly erred in doing so. Accordingly, this Court affirms the circuit court's judgment to the extent that it denied post-conviction relief based on Doss' *Atkins* claim.

## CONCLUSION

¶52. Accordingly, for the reasons stated herein, the judgment of the Circuit Court of Grenada County is affirmed to the extent that it denied post-conviction relief based on Doss' *Atkins* claim. The circuit court's judgment is reversed to the extent that it denied post-conviction relief based on Doss' claim of ineffective assistance of counsel during the penalty phase, and this case is remanded to the trial court with instructions to vacate Doss' death sentence and to grant Doss a new penalty phase sentencing hearing, consistent with this Court's opinion.

¶53. **PART ONE: REVERSED AND REMANDED. PART TWO: AFFIRMED.**

37

**PART ONE: WALLER, C.J., DICKINSON, KITCHENS, AND CHANDLER, JJ., CONCUR. DICKINSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J. CHANDLER, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND DICKINSON, J. LAMAR, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, P.J., RANDOLPH AND PIERCE, JJ.**

**PART TWO: WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.**

**DICKINSON, JUSTICE, SPECIALLY CONCURRING:**

¶54. I fully join Presiding Justice Graves's excellent analysis of the first issue, and I agree that this matter should be remanded for a new sentencing hearing. I write separately because of my concern that, in recent years, the acceptable standard for effective assistance of counsel in death-penalty cases has slipped to an unacceptably low level. *See e.g.* **Byrom v. State**, 927 So. 2d 709, 731-32 (Miss. 2006) (Dickinson, J., dissenting).

¶55. Although I have no personal reluctance in voting to affirm the death penalty in an appropriate case, I cannot do so where the defendant has not had reasonable (not necessarily perfect) representation and a fair trial; and particularly during the phase of the trial in which the fact-finder decides whether or not to put the defendant to death.

¶56. Doss – who very well may deserve the death penalty – certainly did not have effective or reasonable representation during the penalty phase of his trial. I find it amazing that anyone might conclude otherwise, after reading the affidavit[9] submitted by his trial counsel. I agree that we must remand for a new sentencing hearing on the question of whether Doss should be executed or serve life without parole.

---

[9]The content of the affidavit is set forth in detail in Presiding Justice Graves's opinion.

**CHANDLER, J., JOINS THIS OPINION**.

**CHANDLER, JUSTICE, SPECIALLY CONCURRING:**

¶57.   I concur with the majority opinion authored by Justice Graves, holding that Doss received ineffective assistance of counsel. I agree with the majority that Anthony Doss's trial counsel, Lee Bailey, rendered constitutionally ineffective assistance at the penalty phase of Doss's trial because he failed to investigate all available evidence in mitigation. I write separately to additionally express that, in my opinion, counsel's performance was deficient because he did not obtain records from the Chicago Public School system that would have been generated when Doss was determined to be learning-disabled and placed into special education classes. Had counsel obtained these records, he would have had access to federally-mandated information from teachers, school officials, and Doss's mother and stepfather quite possibly, regarding Doss's behavior, homelife, intellectual capacity, and academic functioning.

¶58.   As established at the evidentiary hearing, Bailey obtained documents from Doss's public defender in Memphis. These documents included a copy of the public defender's request for records from Faraday Elementary School in Chicago, which was attached to a one-page copy of Doss's registration card from the Chicago Public School system. This registration card showed that Doss had been enrolled in the Chicago Public School system through the ninth grade. Bailey's records from Memphis also included transcripts from Marshall High School, which showed that Doss had attended part of the ninth grade there, and that his last day was March 29, 1988. This was consistent with the evidence that Doss moved from Chicago to Calhoun City, Mississippi, in March 1988.

39

¶59. The registration card shows that the last academic year that Doss attended Faraday Elementary School was the 1986-1987 school year, when Doss was in the eighth grade. Doss turned fourteen in November of that school year. A handwritten note at the bottom of the page containing the copy of the registration card stated: "Anthony Doss received Learning Disabilities Resource Services while at Faraday. All of his school records were sent to Marshall High School including those Special Education Records. s/ [illegible], Counselor."

¶60. According to the 1986 version of regulations promulgated by the United States Department of Education, beginning on October 1, 1977, before special education services were provided to a child, a public agency was required to "have in effect an individualized education program for every handicapped child who is receiving special education from that agency." 34 C.F.R. § 300.342 (1986), *see also* Education for All Handicapped Children Act of 1975, Pub. L. No. 94-142, 89 Stat. 773 (codified as amended at 20 U.S.C. §§ 1400-1461 (1982)). An "'individualized education program' means a written statement for a handicapped child that is developed and implemented in accordance with §§300.341-300.349." 34 C.F.R. § 300.340 (1986). The public agency was to make efforts to include the child's parents at meetings for the purpose of developing an individualized education program, along with teachers and other individuals. 34 C.F.R. § 300.344 (1986).

¶61. An evaluation of a handicapped child was to be conducted by "a multidisciplinary team or group of persons, including at least one teacher or other specialist with knowledge in the area of suspected disability." 34 C.F.R. § 300.532(e) (1986). The team was to assess the child "in all areas related to the suspected disability, including, where appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance,

communicative status, and motor abilities," and it was permitted to use tests for assessment purposes. 34 C.F.R. § 300.532(a),(f) (1986).

¶62. According to the counselor's note, Doss received learning-disabilities services at Faraday. For a school-aged child suspected of having a specific learning disability, the evaluation team was to include the child's regular teacher, or a regular classroom teacher qualified to teach a child of his or her age, and "at least one person qualified to conduct individual diagnostic examinations of children, such as a school psychologist, speech-language pathologist, or remedial reading teacher." 34 C.F.R. § 300.540 (1986). A determination that a child had a specific learning disability was governed by 34 C.F.R. § 300.541, which stated:

> (a) A team may determine that a child has a specific learning disability if:
>
> > (a)(1) The child does not achieve commensurate with his or her age and ability levels in one or more of the areas listed in paragraph (a)(2) of this section, when provided with learning experiences appropriate for the child's age and ability levels; and
> >
> > (a)(2) The team finds that a child has a severe discrepancy between achievement and intellectual ability in one or more of the following areas:
> >
> > > (a)(2)(i) Oral expression;
> > >
> > > (a)(2)(ii) Listening comprehension;
> > >
> > > (a)(2)(iii) Written expression;
> > >
> > > (a)(2)(iv) Basic reading skill;
> > >
> > > (a)(2)(v) Reading comprehension;
> > >
> > > (a)(2)(vi) Mathematics calculation; or

(a)(2)(vii) Mathematics reasoning.

(b) The team may not identify a child as having a specific learning disability if the severe discrepancy between ability and achievement is primarily the result of:

(b)(1) A visual, hearing, or motor handicap;

(b)(2) Mental retardation;

(b)(3) Emotional disturbance; or

(b)(4) Environmental, cultural or economic disadvantage.

34 C.F.R. § 300.541 (1986). Pursuant to 34 C.F.R. § 300.543, an evaluation team was required to make a written report of the evaluation's results, to include a statement of:

(b)(1) Whether the child has a specific learning disability;

(b)(2) The basis for making the determination;

(b)(3) The relevant behavior noted during the observation of the child;

(b)(4) The relationship of that behavior to the child's academic functioning;

(b)(5) The educationally relevant medical findings, if any;

(b)(6) Whether there is a severe discrepancy between achievement and ability which is not correctable without special education and related services; and

(b)(7) The determination of the team concerning the effects of environmental, cultural, or economic disadvantage.

34 C.F.R. § 300.543 (1986). All information used in making the determination had to be documented. 34 C.F.R. § 300.533(a)(2) (1986). Moreover, a reevaluation of a child was to be conducted every three years, or more frequently if warranted or requested by the child's parent or teacher. 34 C.F.R. § 300.534(b) (1986).

42

¶63.    The United States Supreme Court in ***Rompilla v. Beard***, 545 U.S. 374, 382, 393, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), recognized that the school records of a defendant who, like Doss, dropped out in the ninth grade, were one avenue counsel fruitfully could have followed to obtain mitigating evidence to meet the State's case of aggravation. The Memphis public defender's file placed Bailey on notice that Doss had been designated as learning-disabled while attending the Faraday school. As the applicable regulations make clear, had Bailey obtained the associated documentation, he would have had access to a wealth of information about Doss's childhood in Chicago which he could have used either as mitigating evidence, or as a lead for locating other mitigating evidence. The evidence unearthed by Doss's post-conviction counsel about Doss's impoverished living conditions in Chicago, his family's abuse at the hands of Sam Brown, his mother's alcohol abuse, his own early drug abuse, his low I.Q., and his psychological disorders hints at the helpful information this documentation was likely to have contained.[10]  In my opinion, Bailey's failure to obtain this documentation, despite his notice of its existence, constituted deficient performance that combined with the other omissions cited by the majority to prejudice Doss.

¶64.    Moreover, I am quite confident that Doss was prejudiced by counsel's deficient investigation. As the majority recognizes, the missing mitigating evidence was very similar to that in ***Rompilla***, such that, taking the evidence as a whole, it "might well have influenced the jury's appraisal of [Doss]'s culpability." ***Rompilla***, 545 U.S. at 393. However, my

---

[10] I note the fact that Doss was determined to be learning-disabled indicates that his evaluators did not consider him to be mentally retarded. *See* 34 C.F.R. § 300.541(b)(2) (1986).

43

conclusion that Doss was prejudiced is bolstered by the fact that Doss's jury actually indicated its ambivalence during penalty-phase deliberations by sending a note to the judge stating: "To Judge: Do we have the option of 'Life without parole'?" The note plainly shows that the imposition of the death penalty was not a clear-cut decision for the jury. There is a reasonable probability that, but for counsel's failure to investigate the available mitigating evidence, the penalty phase would not have resulted in a sentence of death.

**WALLER, C.J., AND DICKINSON, J., JOIN THIS OPINION.**

**LAMAR, JUSTICE, DISSENTING TO PART ONE:**

¶65. I disagree with the majority's conclusion that Doss received ineffective assistance of counsel under the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 674 (1984). Therefore, I respectfully dissent.

¶66. In applying the test set forth in *Strickland*, "a court should keep in mind that the principles . . . do not establish mechanical rules . . . [and] the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696. Under the first prong, "the defendant must show that counsel's representations fell below an objective standard of reasonableness." *Id.* at 688. In assessing reasonableness, "every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Further, there is a strong presumption that counsel's conduct was the result of sound trial strategy, and the reasonableness of an investigative decision "is substantially influenced by the defendant's own statements or actions." *Id.* at 689, 691.

44

¶67. Under the prejudice prong, a "defendant must show that there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. To assess prejudice, the court must reweigh the evidence in aggravation against the evidence in mitigation and determine whether "the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695; *see Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). Therefore, the trial court had to determine whether there was a reasonable probability that the jury would not have imposed a sentence of death had it also heard the testimony and reviewed the evidence presented in 2006.

¶68. Under the proper standard of review, this Court cannot disturb the trial court's factual findings unless they are *clearly erroneous*. *Loden v. State*, 971 So. 2d 548, 572 (Miss. 2007). This Court must give deference to the trial judge's findings of fact, since he or she is the "'sole authority for determining credibility of the witnesses.'" *Id.* (quoting *Mullins v. Ratliff*, 515 So. 2d 1183, 1189 (1963)). I find that this Court has improperly reweighed the evidence presented at the PCR hearing, and further, that it has improperly reviewed evidence that was not admitted before the trial court.

¶69. First, the majority provides a lengthy and unnecessary analysis of the affidavits attached to Doss' motion for post-conviction relief.[11] The affidavits of Lee Bailey and Kelvin Winbush were never admitted into evidence before the trial court, and it is improper

---

[11] As noted by the majority, I summarized some of the affidavits in my original opinion, *Doss v. State*, which is being withdrawn. Unlike the majority, I did not characterize these affidavits as evidence, which they are not.

for this Court to consider them as evidence on appeal.[12]  Second, the Court fails to consider any of the aggravators presented at the first sentencing hearing, and as a consequence, its conclusion of prejudice lacks foundation from the record.

¶70.   In 1993, the jury heard testimony from Frank Coffey, Sadie Doss, and E.J. Bobo.[13] Coffey testified that Doss had traveled to Memphis, Tennessee, after the murder of Bell, and that Doss had committed a second murder in Memphis.  Coffey confirmed that Doss had been convicted of second-degree murder.  E.J. Bobo, an officer with the Calhoun Sheriff's Department, testified that Doss had a bad reputation for peace and violence.

¶71.   Sadie Doss testified that Doss had finished the ninth or tenth grade.  She testified that they had a "beautiful home," and that Anthony was a "warm, beautiful person" who would prepare her food and help her when she was sick.  However, Sadie also testified that she had relied on welfare when Doss lived with her.  She stated that Doss had suffered two serious head injuries, one when he was eleven and one when he was seventeen.  As to the effects of the head injuries, she testified that "[Doss] would have headaches.  Some days he won't say nothing.  Then, the next day, he talk."  On cross-examination, Sadie admitted that Anthony had been convicted of second-degree murder in Tennessee.

¶72.   At the conclusion of the sentencing hearing, the trial court presented the jury with the following instructions as to aggravating and mitigating factors:

---

[12] The trial court noted that Bailey's 2006 testimony conflicted with his affidavit.  At the time Bailey signed his affidavit, he was unable to locate certain records or review Doss' file, which he had given to Doss' post-conviction- relief counsel.

[13] All evidence that was admitted at the guilt phase was also reintroduced at the sentencing phase.  *See Doss v. State*, 709 So. 2d 369 (Miss. 1996), for discussion of the underlying facts of this case.

Consider only the following elements of aggravation in determining whether the death penalty should be imposed:

1. The defendant, Anthony Doss, was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.
2. The capital murder of Robert C. "Bert" Bell was committed while the defendant was engaged or was an accomplice, in the commission of armed robbery.
3. The capital murder of Robert C. "Bert" Bell was committed for the purpose of avoiding or preventing lawful arrest.
. . .

Consider the following elements of mitigation in determining whether the death penalty would [sic] not be imposed:

(1) The age of Defendant at the time of the crime.
(2) Loving and caring child to his mother.
(3) Grew up in poverty environment.
(4) Lack of significant father figure.
(5) Suffered head injuries which changed personality.
(6) The Defendant acted under extreme duress or under substantial domination of another person.
(7) The Defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.
(8) Went into store with gun that wouldn't fire.
(9) Lack of education.
(10) Intervened in [sic] behalf of Robert James.

After weighing the aggravators and mitigators, the jury sentenced Doss to death.[14]

¶73.     As the majority notes, the trial court conducted a PCR evidentiary hearing in 2006 and heard testimony from Lee Bailey, Q.T. Doss, Sadie Doss, Sandra Price, and Sam Phillips. Contrary to the majority's conclusion, I find that Bailey did perform a reasonable investigation for mitigation evidence. First, Bailey was in contact with the Capital Defense Resource Group, which provided him with information regarding the defense of a death-penalty case. Bailey testified that he had utilized the materials provided to him.

---

[14] The jury unanimously found that all aggravators existed beyond a reasonable doubt.

¶74.   Bailey also testified that he had obtained school, mental health, and medical records from Carolyn Watkins, Doss' public defender in Memphis, Tennessee.[15] Bailey's testimony reveals that the decision not to introduce these documents was strategic.[16] The following exchange took place between Bailey and the State as to why he did not use these documents at the sentencing phase:

> Q.  There was a reason you didn't want me [the prosecutor in the original trial] to even know about that stuff at the time, wasn't it?
> A.  Well, I mean it, it has some information about other acts by Anthony.
> Q.  Robberies.
> A.  Yeah.
> Q.  As a matter of fact, he was being evaluated, according to him, because he had committed robberies.  And he had been sent to the youth court there for robberies and drug treatment; is that right?
> A.  Correct.
> Q.  Also in the stuff that I never got at that time that is in the stuff that you did seek and get it showed that he was tested and his test scores showed his IQ at 80; is that correct?
> A.  Correct.
> Q.  You didn't want me to have that either, did you?
> A.  No.
> . . . .

---

[15] The record shows that Bailey contacted Watkins on three, separate occasions.

[16] The undated Discharge Summary mentioned that Doss' "legal problems stem from robberies," that he drank alcohol regularly, had tried other drugs, and that he had an estimated IQ of 80.

The 1988 Psychological Report stated that Doss had been placed on probation with the Calhoun County Youth Court as a result of guilty pleas to breaking and entering, possession of marijuana, and causing a family disturbance.  The report also stated that Doss had robbed an elderly man in Chicago.  It mentioned that Doss had primarily attended special education classes in Chicago, but had been mainstreamed into some regular classes in junior high school, where he had achieved some success.  It stated that Doss wanted to go back to Chicago, and that he had a 71 IQ after testing.  It further provided that Doss' mental difficulties *might* have an organic basis.  The report made no mention of Sadie's drinking problems and the terrible existence she described in living with Sam Brown in Chicago.

Q. Okay. Now, and we've talked about this. It was furnished in discovery. If all of this stuff that you had available to you had been presented, we would have possibly been able to, in addition to what the jury heard, been able to bring out that he had been charged with robberies. He had been charged with selling drugs. He had been charged two days before this murder with shooting someone else in Bruce. All of that stuff would have possibly been able to have been brought out for the jury is that correct?

[objection to speculation; court allows questioning to continue]

Q. You know about all these other charges, don't you, from the reports?
. . .

A. It was available.
Q. You had your file at that time.
A. Yeah.

¶75. The majority also takes issue with the fact that Bailey failed to investigate the extent of Doss' head injuries. However, Bailey testified that further investigation was not warranted, since Doss could clearly communicate with him and was competent to stand trial. Bailey stated:

> In talking with Anthony – I mean I spent some time talking with him. And I didn't – I didn't see where Anthony had a problem discussing this case with me. He told me everything about it. He explained how he grew up. I remember taking down notes about his early life . . . . I remember talking to him about different aspects of the case.

49

¶76. Bailey also relied in part on Doss and Sadie[17] to provide names of potential witnesses to testify at the sentencing hearing. Bailey testified that he had "no reason to believe that there was anyone in Chicago that could help Anthony Doss." Doss and Sadie provided only the name of one witness, Mark Hendricks, the Chief of Police in Derma, Mississippi. Doss worked for Hendricks as a confidential informant on drug cases. Bailey wanted to introduce this testimony, but if Hendricks had testified, the State was prepared to cross-examine Hendricks on several criminal violations involving Doss. While Bailey filed a motion in limine to exclude this testimony, the trial court denied it.

¶77. Bailey also obtained court funds to hire an investigator, Kelvin Winbush. Winbush located and interviewed seven potential witnesses: Lillie Moore, Doss' aunt; Coach Smith, Doss' former physical education teacher; Marvin Joe Doss, Doss' brother; Randy Doss, Doss' brother; Lucretian Monger, Doss' sister; and Mavis McCaster, Doss' sister. Bailey decided not to use them as witnesses, since their testimony would not have been mitigating.

¶78. The majority also argues that a proper investigation would have yielded the testimony of Q.T. Doss, Sandra Price, and Sam Phillips, in addition to the expanded testimony of Sadie Doss. Q.T. Doss, Doss' cousin, testified that they had spent time together and had done yard

---

[17] The majority incorrectly states that Bailey spoke only once with Sadie via telephone. Bailey testified: "I had several – I had telephone calls. I say several. I don't think there was but maybe one or two on my timesheet, but I know I talked to her more times than that by telephone."

The majority also concludes that Bailey failed to elicit personal information from Sadie at the first sentencing hearing. His failure to question Sadie as to the information that she testified to in 2006 was a direct consequence of her failure to provide that information to him. In reviewing the mitigating instruction submitted at the first sentencing hearing, as well as Sadie's testimony, it is evident that Bailey did in fact try to solicit personal information that is crucial at the sentencing phase.

work together when Doss visited Mississippi, and later when Doss moved back from Chicago as a teenager. Q.T. stated that Doss was a quiet person and a follower, not a leader. Q.T. testified that Doss eventually had begun to hang around with Frederick Bell, and Q.T. felt that Bell was a bully and troublemaker. Q.T. testified that Doss knew how to defend himself, but Q.T. was unaware of Doss having a gun.

¶79. At the 2006 hearing, Sadie testified that she had drank alcohol regularly when she was pregnant with Doss, that she had contracted gonorrhea at around that time, and Sam Brown had beaten her to the point that she had almost miscarried. She testified that other members of her family had suffered from mental problems. Sadie stated that she did not tell strangers about these problems, and that Bailey did not ask anything about the private details of her life.

¶80. Sandra Price testified that Sam Brown was her father and that she had lived with Brown, Sadie, and Doss in Chicago. Price confirmed at the 2006 hearing the brutal treatment the family had received from Sam Brown, who was also a drug user. She stated that Doss was a quiet person who generally stayed to himself. Price also testified that the family had lived in a neighborhood where gang activity and violence were common. Sandra denied that she had seen Sadie abuse alcohol or drugs. She testified that in 1989, she had been raped and beaten by a gang of men who broke into their residence, and that Doss also had been beaten by these intruders. The State suggested that the attack was in retaliation for Doss' selling drugs.

¶81. Sam Phillips testified at the 2006 hearing that he was the biological father of Anthony Doss and that he and Sadie had never married. Phillips also testified that he had raised two

51

children who had never been in trouble with the law. Phillips further testified that he had repeatedly told Doss to stop selling drugs and leave the streets.

¶82. The trial court concluded that Bailey had provided effective assistance of counsel to Doss. The court summarized Bailey's testimony and concluded that Bailey was not to blame for Doss and Sadie's "lack of forthrightness." The circuit court also found that Lee Bailey had no trouble communicating with Doss, and Doss did not appear to be insane. The court also noted that at the time of Doss' trial, execution of the mentally retarded was not prohibited. The circuit court found that nothing in the records indicated that Doss was mentally retarded, or that Bailey should have consulted a mental-health expert.

¶83. The trial court was presented with conflicting testimony from Sadie. Her testimony on alcohol abuse and mental problems contradicted her 1993 testimony and the information that she had provided in the 1988 Psychological Report. Furthermore, Sandra Price testified that Sadie did not drink or abuse drugs. The court concluded that "a mother's testimony would be somewhat suspect and totally biased in favor of her child facing the death penalty."

¶84. As for Sandra Price's testimony, the trial court found that the sympathy that she may have generated for Doss would have been offset by her testimony that she believed Doss had not murdered anyone. Further, the court also found that the jury would have been concerned by her testimony that Doss' actions may have triggered the home invasion.

¶85. The trial court also found that the testimony of Q.T. Doss and Sam Phillips would not have swayed the jury to impose a sentence other than death. The trial court concluded that Q.T. Doss' testimony "would have indicated to the jury that Anthony was making a conscious decision to associate with persons of bad character." The trial court also found

52

that Phillips's testimony that Anthony would have been better off raised in his household was pure speculation.

¶86.     After reviewing the evidence presented at the 2006 hearing, the trial court concluded in a thorough, thirty-seven-page opinion that the jury still would have sentenced Doss to death.  After reviewing the record, I cannot say that the trial court's findings of fact are clearly erroneous.  Bailey certainly undertook a reasonable investigation that yielded little mitigation evidence.  Doss and Sadie (along with the seven family members when Winbush interviewed) failed to disclose any details of Doss' life in Chicago, and Doss failed to exhibit any mental deficiencies. Under *Strickland*, the "reasonableness of an investigative decision "is substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 689, 691.

¶87.     Furthermore, I do not find that there is a *reasonable probability* that, but for Bailey's (alleged) errors, the outcome would have been different.  While the evidence presented in 2006 would have garnered some sympathy, it also would have acted as a double-edged sword by referencing Doss' propensity for violence and substance abuse.  *See Burger v. Kemp*, 483 U.S. 776, 791-95 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987).  Furthermore, the majority affords no deference to the trial court's findings of fact, and in my opinion, has improperly reweighed the evidence to conclude with hindsight that Doss received ineffective assistance of counsel.  I would affirm the trial court's judgment that Doss received effective assistance of counsel at the penalty phase of this trial.

**CARLSON, P.J., RANDOLPH AND PIERCE, JJ., JOIN THIS OPINION.**

**GRAVES, PRESIDING JUSTICE, DISSENTING TO PART TWO:**

53

## II. WHETHER THE DECISION IN *ATKINS v. VIRGINIA* REQUIRES THAT THE DEATH SENTENCE IN THIS CASE BE SET ASIDE.

¶88. The majority of this Court relies on an incomplete and admittedly partially inaccurate report from the State Hospital at Whitfield (the Whitfield Report) to find that Anthony Doss is not mentally retarded pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).[18] Because I would find that the evidence in this case clearly requires a finding that Doss is mentally retarded, I respectfully dissent.

¶89. The majority acknowledges in footnote 6 that it is "speaking in terms of the report's contents," despite testimony offered to correct, clarify and complete the report. Further, this report clearly states that it was written without the experts being able to contact numerous people and without benefit of substantial, relevant information. The report says: "[H]owever, these attempts were unsuccessful at the time this report was written. Although we requested more complete school records for Mr. Doss, the psychological testing report and raw data from North Mississippi Medical Center, and the raw data from a prior psychological evaluation by Dr. Gelbort, we had not received those records at the time this report was written." The report later says: "However, this opinion is limited by a lack of available records related to Mr. Doss' school history and other prior intellectual assessments, as well as obstacles encountered when attempting to assess adaptive functioning in individuals who have been on death row for an extended period of time." I write separately

---

[18]The Whitfield Report finds that Doss obtained a full scale IQ score of 71. However, Dr. Gilbert McVaugh conceded at trial that he made a scoring error and that the correct full-scale score should have been 70.

because I submit that an analysis of the entire record and applicable law is necessary to decide this issue.

¶90.    In *Chase v. State*, 873 So. 2d 1013 (Miss. 2004), this Court clarified the application of *Atkins* in the trial courts as follows:

> The *Atkins* majority cited, with approval, two specific, almost identical, definitions of "mental retardation." The first was provided by the American Association on Mental Retardation (AAMR):
>
> > *Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.
>
> *Atkins*, 536 U.S. at 308 n.3, citing Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed. 1992). The second was provided by The American Psychiatric Association:
>
> > The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed. 2000).
>
> *Id*.
>
> The Diagnostic and Statistical Manual of Mental Disorders, from which the American Psychiatric Association definition is quoted, further states that "mild" mental retardation is typically used to describe persons with an IQ level of 50-55 to approximately 70. *Id*. at 42-43. The Manual further provides,

55

however, that mental retardation may, under certain conditions, be present in an individual with an IQ of up to75. [n.18] *Id*. at 40. Additionally, according to the *Atkins* majority, "it is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, *which is typically considered the cutoff IQ score* for the intellectual function prong of the mental retardation definition." *Id*. citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds 7th ed. 2000) (emphasis added).

> n.18 This point is conceded by the State. However, IQ, alone, does not determine mental retardation. According to the DSM-IV, "it is possible to diagnose Mental Retardation in individuals with IQ's between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.

These definitions were previously adopted and approved by this Court in *Foster v. State*, 848 So. 2d 172 (Miss. 2003). This Court further held in *Foster* that the Minnesota Multiphasic Personality Inventory-II (MMPI-II) is to be administered since its associated validity scales make the test best suited to detect malingering. . . . Foster must prove that he meets the applicable standard by a preponderance of the evidence. . . . This issue will be considered and decided by the circuit court without a jury.

*Id*. at 175.

These definitions, approved in *Atkins*, and adopted in *Foster*, together with the MMPI-II, [n.19] provide a clear standard to be used in this State by our trial courts in determining whether, for *Eighth Amendment* purposes, a criminal defendant is mentally retarded. The trial judge will make such determination, by a preponderance of the evidence, after receiving evidence presented by the defendant and the State.

> n.19 Although this Court has identified the MMPI-II as a test that should be given, we now clarify our position by stating that the expert should use the MMPI-II, and/or any other tests and procedures permitted under the Mississippi Rules of Evidence, and deemed necessary to assist the expert and the trial court in forming an opinion as to whether the defendant is malingering.

> *Procedure to be used*.

Having established the definition of mental retardation to be used for purposes of *Eighth Amendment* protection to mentally retarded defendants, we now turn to the procedure to be used in reaching a determination of mental retardation.

We hold that no defendant may be adjudged mentally retarded for purposes of the *Eighth Amendment*, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:

1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;

2. The defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

Such expert must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation.

Upon meeting this initial requirement to go forward, the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence.

Thereafter, the State may offer evidence, and the matter should proceed as other evidentiary hearings on motions.

At the conclusion of the hearing, the trial court must determine whether the defendant has established, by a preponderance of the evidence, that the defendant is mentally retarded. The factors to be considered by the trial court are the expert opinions offered by the parties, and other evidence if limitations, or lack thereof, in the adaptive skill areas listed in the definitions of mental retardation approved in *Atkins*, and discussed above. Upon making such determination, the trial court shall place in the record its finding and the factual basis therefor.

***Chase v. State***, 873 So. 2d at 1027-29.

¶91.   Doss underwent a psychological evaluation at the University of Mississippi in 1988 pursuant to a youth-court proceeding. Despite the majority's assertion that "Doss had at least

57

two prior psychological evaluations at the age of fifteen, neither of which resulted in a diagnosis of mental retardation," the record indicates that Doss was "to be evaluated for possible drug problems which may be contributing to his behavior" and **not** for the purpose of determining if he was mentally retarded pursuant to *Atkins*. More significantly, despite the majority's statement that "[t]hese evaluations found that Doss did not demonstrate deficits consistent with mental retardation . . . ," there was absolutely no finding that Doss is not mentally retarded pursuant to *Atkins*. Notwithstanding the purpose for which Doss was evaluated, the report from this evaluation indicated as follows: 1) On the Wide Range Achievement Test-Revised (WRAT-R), Doss achieved a sixth-grade level in Arithmetic and below a third-grade level in reading and spelling; 2) on the Wechsler Intelligence Scale for Children-Revised (WISC-R), Doss obtained a verbal scale IQ of 67, placing him in a mentally deficient intelligence classification, a performance scale of 80, placing him in a low-average intelligence classification, and a full scale of 71, placing him in a borderline classification of intelligence; 3) "The Bender Motor Gestalt Motor Test revealed that there may be some organic basis to Anthony's difficulties," as Doss showed poor planning, perceptual difficulties, inattentiveness and a hurried approach to tasks; 4) the Millon Adolescent Personality Inventory (MAPI) revealed "no unusual test-taking attitudes that may have distorted the MAPI results."[19]

---

[19]Another IQ test was administered to Doss at North Mississippi Medical Center that produced a result of 80. However, this test was administered just a few months after the University of Mississippi test and was merely an estimated score based on a shortened version of an exam. Dr. Criss Lott, who was contracted by the Mississippi State Hospital to assist in the evaluation of Doss, acknowledged that this test was not a true result. Lott testified: "There could possibly be a practice effect there. It was also an estimated IQ. That

¶92. In 2001, Dr. James Merikangas executed an affidavit, which was attached to Doss' application for leave filed with this Court, outlining the need for a neuropsychiatric evaluation on Doss and opining that the University of Mississippi report from 1988 suggests organic brain damage and mental retardation. Doss also attached the affidavit of Jeffrey Eno, a clinical and forensic social worker, to his application for leave. Eno provided a life history of Doss, including prenatal history, exposure to lead paint chips, details of his violent, abusive upbringing in a dangerous area, physical injuries, substance abuse, and history of mental issues within the family.

¶93. In 2003, Dr. Michael Gelbort performed a neuropsychological evaluation of Doss at Parchman, during which the following tests were administered: Wechsler Adult Intelligence Scale-III, Wechsler Memory Scale-III subtests, Wide Range Achievement Test-III, Lateral Dominance Examination, Strength of Grip, Trail Making Test, Category Test, items from the Luria Nebraska, and diagnostic interview with mental status testing. Gelbort's report, which was attached as an exhibit to his application for leave, indicated as follows:

> Intellectual testing found Verbal, Performance, and Full Scale IQ scores of 68, 79, and 71, respectively. These scores are virtually identical to those obtained in the distant past and lend weight to the opinion that the patient put forth appropriate effort, as well as that his intellectual functioning is in the borderline mentally retarded range and that he qualifies, in terms of intellectual impairment, for a diagnosis of Mental Retardation.

---

is, they only gave four subtests. So it is not a full IQ. It wasn't a full evaluation in terms of using the full test itself. It was only four subtests." Based on these factors and others testified to at trial, the validity of this result is not reliable.

Exhibit HH, Application for Leave to File Motion to Vacate Judgment and Sentence, 1999-DR-296 (May 20, 2003). Gelbort's impressions were:

> Consistent with the past test results, Mr. Doss presents with a Full Scale IQ score between the second and third percentile qualifying him for a diagnosis of Mental Retardation. A clinical social worker is collecting information about Mr. Doss and investigating the other issues involved in making a definitive diagnosis. In any event, the patient is showing clear and consistent impairments in frontal lobe functioning and bilateral temporal lobe functioning with notable impairments in reasoning, judgment, problem solving, and all types of new learning and memory skills. Based on the current evaluation and historical information reviewed, Mr. Doss does qualify and is diagnosed with Organic Brain Dysfunction, also diagnosed as Cognitive Disorder NOS based upon other nosological systems. The data and historical information reflect that these deficits are likely both congenital and acquired at an early age, predate the event for which he was tried and convicted, and were as readily and easily observed and diagnosed at the time of his original trial as they are at this point in time. They have a significant impact and effect on his behavior with the patient having impairments in the abilities of problem solving and reasoning, as well as anticipating the consequences of his behavior and planning adaptively and effectively into the future because of his neurocognitive impairments.

Exhibit HH, Application for Leave to File Motion to Vacate Judgment and Sentence, 1999-DR-296 (May 20, 2003).

¶94. While acknowledging the State's questions concerning Doss' claims, this Court granted Doss leave to present his *Atkins* claim before the trial court. The trial court appointed the Mississippi State Hospital to make a determination of whether Doss is mentally retarded. Doss was examined by Drs. Gilbert MacVaugh III, Criss Lott, John Montgomery, and Reb McMichael in November 2005. At the evidentiary hearing, Doss called Dr. Lott, who was contracted by the Mississippi State Hospital to assist in the evaluation of Doss, Dr. Daniel Grant, and Dr. Timothy Summers as witnesses. The State called Drs. MacVaugh and McMichael, employees of the Mississippi State Hospital, as witnesses.

60

¶95. Doss was administered the Stanford Binet Fifth Edition test by Grant on May 5-6, 2005. Doss' full-scale IQ score was 62. Doss was administered the Wechsler Adult Intelligence Scale-III (WAIS-III) during the evaluation at the Mississippi State Hospital (Whitfield) on November 2, 2005. Doss received a corrected full-scale IQ score of 70 on the WAIS-III, which is a standardized test of adult intelligence.

¶96. Experts for both the State and the defendant agree that Doss meets the first criterion of significantly subaverage intellectual functioning manifested before age eighteen.[20] Lott testified repeatedly that he agreed that the testing of Doss meets the first criterion, that Doss has significantly subaverage intellectual functioning that was manifested before age eighteen. Lott also testified that Doss had scored low consistently over the years with the exception of the estimated IQ in 1988, which Lott acknowledged was not a true result. *See supra* note 3. MacVaugh testified, in relevant part: "The, the range of scores on IQ test for mild mental retardation is approximately 70 to 50 to 55. So I think that is the range that we are talking about here in Mr. Doss' case." MacVaugh also testified that Doss meets the intellectual-impairment prong of *Atkins*. "But in a forensic context, particularly this case, with the criteria set forth by *Chase* and *Atkins*, I think he does satisfy the cognitive or intellectual

_____

[20]Because there is no question that Doss meets the first prong of significantly subaverage intellectual functioning, the majority's discussion regarding malingering is unnecessary and irrelevant. Moreover, the majority's statement that "[t]he evaluation stated that [Doss'] true IQ score may have been higher, but possible malingering or fatigue may have factored in the scoring," is incomplete. While the report did say Doss' score may be higher, it also said Doss' true score may be three points less, or 67. Testimony also indicated that Doss' score could be considerably less. Further, the report specifically said fatigue may have factored into Doss' score on one measure of malingered memory deficits, i.e., TOMM, but also that Doss was cooperative and put forth a good effort.

61

impairment prong of *Atkins*. So I don't – I think he does have mild mental retardation in terms of the intellectual impairment prong of the diagnosis."

¶97. As Doss meets the first prong of significantly subaverage intellectual functioning manifested before age eighteen, the relevant issue is then whether Doss has related or significant deficits in adaptive functioning. Adaptive-skill areas are communication, self-care, functional academics, community use, self-direction, health and safety, leisure, and work. The record indicates that Doss does have related or significant deficits in adaptive functioning.[21]

¶98. Grant administered a standardized test to assist in a determination of Doss' adaptive-skills functioning. Grant testified:

> Q. Okay. Okay. The – in terms of adaptive functioning what are your conclusions about, about that issue?
> A. I feel that he has deficits at adaptive functioning.
> Q. Okay. In what areas?
> A. I looked at it from two different points of view. I looked at it from the skills he has on the language area, his language skills are – showed significant deficits. And his academic skills showed significant deficits. And those two areas would fit within – would show – one way of showing that he met poor adaptive behavior. As they said, two sets of deviations below the means in those two areas.
> And I also administered the adaptive – the independent living skills. And the norms for that test for this group is – the means score is – the mean age score is 34, which is what his age is. So I mean he had a score of – a full scale score of 65.
> Q. Okay.

---

[21]The majority discounts findings in the record that establish Doss' adaptive-skills deficits because these findings rely on interviews with Doss. However, the findings in the Whitfield Report substantially rely on interviews with Doss as well. Also, the findings in the Whitfield Report rely on interviews with Sadie Doss, yet the report notes that Sadie has previously been tested and received an IQ score in the mentally retarded range.

A.     And if you notice, he had some, some better scores, some lower scores. And retarded individuals are no different than the rest of us. They have strengths. They have weaknesses. And he had some strengths and some weaknesses in different variables.

Q.     In the full scale standard score of 65, why does that lead you to conclude he has got deficits in adaptive functioning?

A.     Because it's more than two sets of deviations below the mean. It also is consistent – these scores are consistent across all these variables. Almost every test I gave him was within a few points of that score.

Q.     The number 65 here, is that on the adaptive – the independent living scales test or the equivalent of 65 on an IQ test?

A.     Right. With 100 being average.

¶99.   Grant further testified that Doss also had exhibited significant deficits with regard to functional academics, work, and communication. Moreover, Grant concluded that Doss suffered from organic brain dysfunction, which could have been impacted by the head injuries. Grant testified:

Impaired brain. He has problems with attention, problems with concentration. He has nystagmus, moving of the eyes. He has a thin lip, peculiarity of the nose, which is typical in people that have fetal alcohol syndrome. He has – he has concrete thinking. He has problems with memory, problems with – his reasoning was concrete.

¶100.  Summers also testified that Doss has significant deficits in adaptive functioning. Specifically, Summers said:

Well, in my opinion, first of all, if you look at communication issues for one, he certainly has adaptive deficits in communication primarily because number one, he is inattentive. Number two, he is impulsive. Number three, he is mistrustful. Number four, he has difficulty processing. Number five, his general fund of knowledge is poor. Number six, he has difficulty with abstract thinking. Number seven, his memory is poor, particularly his working memory.

If you gave him a problem that involved his remembering a certain amount, amount of information that he could later on use to render a decision, he wasn't able to do that. And his, his general – and then he would rush into solutions very fast without really giving a lot of thought to it. So he was – he was very difficult for me to understand him.

And so finally I had to just finally say wait a minute. Okay. This is what we are here for. This is what I want you to focus on. This is what we are going to talk about. And so he has significant problems as it relates to communication. He thinks nobody loves him. He thinks nobody cares about him. He thinks that –

¶101. Summers also testified that Doss had significant deficits in academic functioning, abstract reasoning, social skills, and interpersonal relations, and that these deficiencies were related to his subaverage intellectual functioning.

> Q. Let me ask you this. Do the – you mentioned in your report some areas of limitations and adaptive functioning. Do you, you believe those stem from and are related to the subaverage intellectual functioning that was already discussed?
> A. Absolutely. I mean – see, it doesn't matter if your intellectual functioning is low because you have head trauma or toxicity to your brain or if your intellectual functioning is low because you lived in an impoverished environment. The end result is still the same.
> But in my opinion, you know, Anthony has had so much, so many problems, so many issues to his brain. I mean he has had – I mean number one, he started out with a mom who was drinking every day. Then number two, she was kicked in the abdomen when she was pregnant to the point that she bled so much that she had to go to the hospital.
> Number three, when Anthony was a little boy then he had lead toxicity. Then after that he had measles at two. And then after that he developed multiple head trauma - baseball bats, sticks, hit in the head with a pistol.
> So, you know, when you get through looking at all those different issues then – now, in addition to that, you also have the psycho-social issues that affect the brain.

¶102. Lott testified that he did not use a standardized test to measure adaptive functioning, but that he reviewed Grant's report, which was based on a standardized test. Lott further testified that it is very hard to assess what someone's adaptive functioning was twenty years ago. Lott discounted the use of the standardized test because he said there have been no studies that norm the test for people on death row.

¶103. Most significantly, Lott testified that he relies on the tenth edition of the AAMR definition, but not in this case.

> Q.     I want to show you the book, 10th edition of the book called *Mental Retardation, Definition, Classification, Assistance and Support* by the American Association of Mental Retardation.  Are you familiar with this book?
> A.     Yes.
> Q.     Okay.  Is it a book that you rely on?
> A.     Yes.
> Q.     Okay.  I want to show you a page, eight, it's called Assumption 1 and just a couple of sentences.  And I want to ask you about it.  Limitations in present functioning must be considered within the context of community environments typical of the individual's age, peers and culture.  This means the standards against which the individual's functioning must be measured are typically community-based environments, not environments that are isolated or segregated by ability.
>        Doesn't that suggest that it is unnecessary to norm a test for someone in an environment that is isolated or segregated like a prison?
> A.     Well, you would norm it.  When you say it's unnecessary to norm it, I am not sure what you mean by not needed.  We, we, we certainly rely on norms.  That is the way we interpret measures.  It would not be appropriate for us to use any test that had not been adequately normed.
> Q.     Right.
> A.     So I'm not sure exactly where you are going with that question.
> Q.     In your report, at the bottom of Page 31, the very last paragraph, you, you, you say that there is standardized assessment interests – assessment instruments for measuring adaptive functioning.  And then you go on to say such instruments have not been standardized for use with offenders who have been incarcerated for a number of years, particularly those on death row.  Then you go on to say that administration of a standardized instrument to measure adaptive skills with a death row inmate would yield invalid results.
>        But given what the – what the AAMR says about the need to measure someone in terms of the community at-large rather than segregated or isolated environment, can't a test like this yield valid results even though it has not been standardized for use with people on death row?
> A.     It would certainly be possible if you had adequate measures here and adequate population for us to look at.  It is very difficult, I think, to take a test like this and to go into death row and ask someone there questions about a defendant's behavior.  And they, they don't have access.  They have limited access on death row to these kinds of activities and behaviors.

Are we assessing at 20? Are we assessing their deficits prior to the age of 18? I think that is the issue here. What do they look like prior to 18? That's, that's the criteria. They have to meet this deficit – these deficit areas prior to the age of 18. Now, it still remains difficult. I think it is questionable as to whether or not we can do that and how adequately and correctly we can do that.

. . .

Q. But the fact that – I mean the fact that it was not normed on the people on death row is not by itself important given the fact that it has been normed with the general population, which is what the AAMR says is important; is that correct?

A. I think you are correct in that a test can be appropriate. For instance, the IQ test that we all use, it wasn't normed on death row inmates and we use that routinely. It's though how adequate that measure is in collecting or obtaining information that you are looking for. An IQ test that we use for the inmates on death row is the same IQ test I use in disability evaluations every day. There is not a specific set of norms for those IQ, IQ results that I get just for death row inmates.

Q. Okay.

A. Okay. I understand that, and I agree with you. The problem though is getting reliable data. . . .

There are a number of tests that we would use that have been normed elsewhere that aren't normed for death row inmates, a number of them. It is just taking that data that we obtained for this instrument and then interpreting it. I think that remains a big problem in this area.

¶104. Lott acknowledged that Doss' history is significant for several risk factors that are correlated with the development of mental retardation, including childhood abuse; abuse of the mother during pregnancy; social and cultural deprivation during infancy, childhood, and into adolescence; the ingestion of lead paint; neglect; possible malnutrition; head injuries; and limitations in functional academics. However, Lott dismissed these factors as not related to Doss' mental retardation.

Q. Now, you said that on the surface Mr. Doss's history might seem to suggest he has demonstrated limitations in some areas of adaptive skills in the community, i.e., functional academics, work, self direction, health and safety. Now, if these things were not related to mental retardation, what were they caused by?

66

A.     By growing up in an environment where one isn't supervised, one isn't monitored, one isn't nurtured, a lot of neglect and possible abuse.

¶105.   Lott acknowledged that limitations in these adaptive skills, even in a person who is not mentally retarded, substantially impact a person and can affect judgment.  Lott testified that most of the basis for finding that Doss was not retarded came from unverified or unexplained information provided by Doss.  Lott said that some of the information was "corroborated in part by family about his ability to maintain independent or close to independent living, developmentally speaking, early on."  Lott specifically mentioned Doss helping his mother when he was eight or nine years old.  Sadie also testified that Doss and his brother had helped her.  However, the record does not establish that Doss did anything substantial to help his mother or anything that would establish that he had no deficiencies in adaptive skills before age eighteen.

¶106.   MacVaugh's testimony was similar to Lott's.  MacVaugh dismissed Doss' deficits in the adaptive areas of functional academics and work because "we had enough data to suggest that his apparent deficits in those areas were due to his personality attributes, his various behavioral problems, substance abuse and other factors that together we would consider maladaptive behavior, not adaptive deficit the way a mental retardation diagnosis requires . . . ."  MacVaugh also discussed Doss' apparent ability to work as a drug dealer.  However, testimony at trial established that Doss was merely following instructions of others and was often assisted by his brother.  MacVaugh also offered the following testimony on the confusion regarding the relationship of adaptive deficits to the significant intellectual impairment:

67

Sure. We as clinicians, think, or at least on our service, maybe I shouldn't speak for my colleagues and should limit this to my own opinion about this, really interpret the definition of mental retardation that consists of the two prongs of intellectual impairment and adaptive functioning impairment as being more than just coexisting. I mean there has to be some relationship between those domains of impairment.

And really the, the view that we have taken in this in order to help us understand this better because it is so difficult to assess, particularly someone who has a history like Mr. Doss, who on the surface may look like they have some of these adaptive deficits but with further analysis there are reasons why that might better explain why they look that way historically.

The issue is whether or not these deficits in adaptive functioning are due to the significantly subaverage intellectual functioning. This is an issue that is very controversial. It has not been explicitly clear in any of the major documents that we rely on in doing our evaluations. . . .

There is no national consensus about what the interpretation is about that, what the approach is to the assessment on that point and that evaluators do lots of different things. It is very variable in terms of how you are approaching the issue. Are the deficits supposed to be due to the intellectual deficits, or do they just somehow coexist?

My own view on that is the reason why it is not clear in the AAMR definition or DSM definition is because when these definitions were written, it was impossible to anticipate that these definitions would be under the microscope in a death penalty case one day because these were written pre-*Atkins* so there was no reason to make that explicitly clear that the intellectual deficits are more than related to the adaptive deficits, that the adaptive deficits should be due to the intellectual deficits.

For example, if somebody is leaving the stove on is it because they have such a severe memory impairment because they forgot to turn it off? Now, that is an example of self-care adaptive deficit that is due to a significant intellectual deficit. Whereas if somebody has an intellectual deficit but, you know, doesn't show some related adaptive deficits related to the intellectual impairments then I question whether that is actually adaptive functioning deficits.

¶107. The testimony of both Lott and MacVaugh was similar to the Whitfield report, which

said, in part:

On the surface, Mr. Doss' history might seem to suggest that he has demonstrated limitations in some areas of adaptive skills in the community (i.e., functional academics, work, self-direction, health, and safety). However, it is our opinion that these apparent difficulties may be better explained by his

68

history of neglect, abuse and maladaptive behaviors, since they did not appear to stem from severe intellectual deficits.

¶108. The Whitfield report also said:

It is noted that Mr. Doss [sic] history is significant for several risk factors that are correlated with the development of mental retardation. For example, during her pregnancy with Mr. Doss, Ms. Doss reportedly abused alcohol regularly, was prescribed valium (anti-anxiety medication), was "kicked" in the stomach . . . leading to blood loss and hospital attention, and reportedly contracted a venereal disease during pregnancy. Mr. Doss also reportedly tested positive for lead poisoning due to exposure to chipping paint as a child. Moreover, Mr. Doss reported (and medical records confirm) that he also has had multiple head injuries over the years.

¶109. The report then discounts these risk factors for mental retardation based on the prior psychological evaluations at the age of fifteen and on a ninth-grade class ranking. However, the report previously acknowledged that Doss had scored in the borderline mentally retarded range as an adolescent. Further, as stated previously herein, Doss was never evaluated as an adolescent for the purpose of determining whether he was mentally retarded pursuant to *Atkins*. Moreover, while Doss was ranked 681 out of 850 students, the report also acknowledges that Doss passed only one out of five subjects that year, while failing the others.[22]

¶110. The Whitfield report further said that despite Doss' IQ, his "apparent difficulties [in adaptive skills] may be better explained by his history of neglect, abuse, and maladaptive behaviors, since they **did not appear to stem from severe intellectual deficits**." (Emphasis

---

[22]Records indicate Doss passed Pre-Algebra with Support, which apparently consisted of two separate classes, including one with individualized assistance by a special education teacher. Doss failed Introduction to High School English, General Science, Art, and Physical Education.

added.) The report also said that "there were no data that suggested Mr. Doss has ever demonstrated **significant deficits in adaptive functioning due to the effects of subaverage intellectual functioning**."[23] (Emphasis added.) However, there is no requirement in the definitions set out previously herein that the deficits in adaptive functioning must be "due to the effects of subaverage intellectual functioning," much less that the adaptive deficits "stem from severe intellectual deficits."

¶111. The AAMR definition for mental retardation, as set out previously herein, states "significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more" adaptive-skill areas. *Atkins*, 536 U.S. at 308. The American Psychiatric Association's definition, also set out previously herein, states "significantly subaverage general intellectual functioning . . . that is accompanied by significant limitations in adaptive functioning in at least two" of the skill areas. *Id*. Also, as noted previously, according to the Diagnostic and Statistical Manual of Mental Disorders, "it is possible to diagnose Mental Retardation in individuals with IQ's between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning."

¶112. In *Rivera v. Quarterman*, 505 F. 3d 349 (5th Cir. 2007), the Fifth Circuit Court of Appeals upheld the federal district court's finding regarding related limitations in adaptive

---

[23]The Whitfield report further states the "opinion is limited by a lack of available records related to Mr. Doss' school history and other prior intellectual assessments, as well as obstacles encountered when attempting to assess adaptive functioning in individuals who have been on death row for an extended period of time."

functioning despite the State's argument that Rivera's adaptive deficits may have been attributable to his abuse of inhalants and not to his mental retardation. In noting that the district court had acknowledged that Rivera's adaptive deficits were just as likely to have been caused by his long-term drug abuse as his diminished intellectual capacity, the Fifth Circuit Court said:

> We read this quote charitably, in support of the district court's own ruling. The district court was likely distinguishing only between etiologies, remarking that some of the deficits were caused by mental retardation from inhalants, and some were caused by mental retardation from other factors. Retardation has, as the experts in this case all agreed, a number of etiologies.

***Rivera***, 505 F. 3d at 363. The Court then quoted the applicable language from ***Atkins***, as follows: "Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." ***Atkins***, 536 U.S. at 308 n.3.

¶113. Clearly, mental retardation is: 1) subaverage intellectual functioning; 2) accompanied by related or significant limitations in two adaptive-skill areas; and 3) manifested before age eighteen. Doss has significantly 1) subaverage intellectual functioning; 2) accompanied by related or significant limitations in two adaptive-skill areas; and 3) it manifested prior to age eighteen. Therefore, the inescapable conclusion is that Doss is mentally retarded. Under the applicable law and based on the facts of this case, it would be illogical to reach any other conclusion.

¶114. Moreover, the State's experts testified that Doss was evaluated under the ninth edition of the AAMR pursuant to ***Atkins,*** and that they were under the mistaken belief that they were required to use this older definition of adaptive functioning rather than that contained in the

71

tenth edition from 2002, which they used in their respective clinical practices. MacVaugh further admitted that using the more current tenth edition to evaluate Doss "could possibly change the diagnosis because the assessment of adaptive skill deficits would, would look different because the definition for them is different conceptually." Therefore, even though the majority finds that there was insufficient evidence to support a finding of mental retardation, this matter still should be remanded for an additional evidentiary hearing to allow the State's experts the opportunity to re-evaluate Doss pursuant to the current definition of adaptive functioning.

¶115. Because I would find that there is sufficient evidence to establish that Doss is mentally retarded or, in the alternative, that he should be re-evaluated pursuant to the tenth edition, I respectfully dissent.

**KITCHENS, J., JOINS THIS OPINION.**